# Illinois Official Reports

## Appellate Court

---

### *Flynn v. Maschmeyer*, 2020 IL App (1st) 190784

---

| | |
|---|---|
| Appellate Court Caption | DARREN FLYNN, TOMASZ BARTOSIEWICZ, and CHICAGO ROOF DECK AND GARDEN, LLC, Plaintiffs-Appellants and Cross-Appellees, v. MICHAEL MASCHMEYER, ANNE MASCHMEYER, and BANK OF AMERICA, N.A., Defendants-Appellees (Michael Maschmeyer, Defendant-Appellee and Cross-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-19-0784 |
| Filed | June 25, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CH-11741; the Hon. Sanjay Tailor, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Remanded with instructions. |
| Counsel on Appeal | Alan J. Mandel, of Alan J. Mandel, Ltd., of Skokie, for appellants.<br><br>Marty Schwartz and Tyler Manic, of Schain, Banks, Kenny & Schwartz, Ltd., of Chicago, for appellees Anne Maschmeyer and Michael Maschmeyer. |

Geoffrey A. Belzer, of Wilson Elser Moskowitz Edelman & Dicker LLP, of Chicago, other appellee.

Panel    PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.

## OPINION

¶ 1  The instant appeal arises from litigation involving defendant Michael Maschmeyer's conduct as a member of plaintiff Chicago Roof Deck and Garden, LLC (CRDG). Maschmeyer[1] owned a 42.5% interest in CRDG, with plaintiffs Darren Flynn and Tomasz Bartosiewicz owning the remainder of the membership interests. After a bench trial, the trial court found that Maschmeyer breached his fiduciary duty as a member of CRDG by usurping business opportunities that should have first been offered to CRDG. The trial court entered judgment in favor of CRDG and against Maschmeyer as follows: (1) $1,768,927 in compensatory damages, (2) $236,350 in prejudgment interest, and (3) $651,104 in punitive damages. The total judgment in favor of CRDG and against Maschmeyer was $2,656,381.

¶ 2  However, the trial court also found that CRDG was required to compensate Maschmeyer for the fair value of his membership interest upon his disassociation from CRDG, which the court found occurred June 16, 2014. The trial court determined that the fair value of this membership interest was $2,867,376 and entered judgment in favor of Maschmeyer and against CRDG in that amount. After setting off the amount of the judgment against Maschmeyer, the trial court's judgments resulted in a net judgment in favor of Maschmeyer and against CRDG in the amount of $210,995.

¶ 3  Both plaintiffs and Maschmeyer appeal, but neither party appeals (1) the finding that Maschmeyer breached his fiduciary duty to CRDG, (2) the imposition of punitive damages,[2] or (3) the addition of prejudgment interest to the judgment against Maschmeyer. In their appeal, plaintiffs challenge (1) the grant of judgment in Maschmeyer's favor or, alternatively, the amount of that judgment, (2) the amount of the judgment in CRDG's favor, (3) the dismissal of plaintiffs' other counts, including counts against defendants Anne Maschmeyer and Bank of America, N.A. (Bank of America), and (4) the denial of plaintiffs' motions for leave to amend their complaint. In his cross-appeal, Maschmeyer challenges the trial court's denial of his requests for interest and attorney fees. For the reasons set forth below, we affirm the trial court's judgment in part, but reverse and remand for the limited purpose of awarding Maschmeyer interest on the judgment in his favor.

---

[1] While Anne Maschmeyer, Maschmeyer's wife, is also named as a defendant in the instant litigation, the sole count against her seeks the imposition of a constructive trust, and her conduct is not at issue. When discussing her, we use her full name to distinguish her from Maschmeyer.

[2] While Maschmeyer does not appeal the trial court's decision to award punitive damages, plaintiffs are appealing the manner in which the punitive damages award was calculated.

## I. BACKGROUND

As noted, while the instant matter was resolved by a bench trial, many of the facts are not disputed by either party. Accordingly, we recite those facts as found by the trial court in its judgment order and draw from the record where necessary to resolve the issues on appeal.

### A. Prelitigation Conduct

Flynn and Maschmeyer were high school friends and long-time business partners, having partnered in several landscaping and real estate development businesses in St. Louis and Chicago prior to forming CRDG. In February 2009, they formed CRDG as an Illinois member-managed limited liability company, with each as a 50% member. CRDG was engaged in the business of outdoor living design and construction services, as well as landscaping services. However, it subcontracted all construction work. Thomas Wood Craft, a construction firm owned by Bartosiewicz, was CRDG's captive subcontractor, building CRDG's showroom and subcontracting with CRDG to build a substantial percentage of CRDG's clients' projects.

Under CRDG's 2009 and 2013 operating agreements, Flynn was the chief executive manager of CRDG, with primary responsibility for managing the operations of CRDG, including responsibility for financial matters. Maschmeyer served as CRDG's sales agent and designer and was responsible for most of the design work; the trial court found that Maschmeyer generated a substantial portion of CRDG's business. On March 25, 2013, Flynn and Maschmeyer admitted Bartosiewicz as a member and manager of CRDG, granting him a 15% membership interest as consideration for cancellation of certain of CRDG's accounts payable to Thomas Wood Craft. As a result, Flynn's and Maschmeyer's interests in CRDG were diluted to 42.5% each.

Neither Flynn nor Maschmeyer received a salary. Under CRDG's operating agreements, Flynn had the exclusive authority to make distributions to its members. Between January 1, 2009, and June 20, 2014, Flynn caused CRDG to distribute $976,754 to Maschmeyer. Flynn estimated that he received approximately $775,000 in distributions during the same period.

Between 2009 and 2014, while he was a member of CRDG, Maschmeyer deposited checks made payable to CRDG and/or himself for roof deck and other related jobs in the aggregate sum of $1,768,927 into his personal bank account. In June 2014, Flynn and Bartosiewicz confronted Maschmeyer and demanded that he repay CRDG $850,000. On June 26, 2014, Flynn and Bartosiewicz sent Maschmeyer a letter with a subject of "Capital Contribution Demand," which was admitted into evidence as an exhibit and which provided, in relevant part:

> "Pursuant to the Limited Liability Operating Agreement of Chicago Roof Deck & Garden, on March 25, 2013, this letter is to notify you that Eight Hundred and Fifty Thousand Dollars ($850,000) is required by you. This amount covers the operating deficit caused by your misappropriation of funds.
>
> You have 5 business days to comply with this capital request demand. Non compliance voids any current or past owed distribution. If [*sic*] after thirty days of non compliance, you will be removed as a member and forfeit any and all rights."

Maschmeyer did not pay this or any other amount to CRDG. Instead, on July 11, 2014, Maschmeyer and Anne Maschmeyer, his wife, formed Urban Rooftops, LLC, an outdoor living design and construction services firm that competes with CRDG.

¶ 11    Plaintiffs filed the instant lawsuit on July 17, 2014, to, *inter alia*, disassociate Maschmeyer from CRDG pursuant to section 35-45 of the Limited Liability Company Act (Act) (805 ILCS 180/35-45 (West 2012)), which we discuss further momentarily. However, on July 28, 2014, plaintiffs notified Maschmeyer that he was removed as a member and manager of CRDG and that current or past distributions owed to him were "void." Flynn and Bartosiewicz reallocated Maschmeyer's interest to themselves, making their membership interests 63.75% and 36.25%, respectively.

¶ 12                                    B. Complaint

¶ 13    As noted, plaintiffs initially filed suit on July 17, 2014; the complaint was amended on March 27, 2015, and it was the amended complaint that was the subject of the bench trial. Flynn and Bartosiewicz filed suit both individually and derivatively on behalf of CRDG, and the amended complaint set forth six counts. Count I was brought by all plaintiffs against Maschmeyer and was for breach of fiduciary duty. Count I alleged that Maschmeyer had used CRDG's assets for projects that benefitted him personally and that he had deposited a number of checks issued to CRDG into his personal bank account. Count I alleged that Flynn and Bartosiewicz were personally damaged because they "have lost the fair value and ongoing income from their interest in Chicago Roof Deck, among other damages." Count I further alleged that CRDG was damaged because it "has been fleeced of extensive assets and value." Count I requested compensatory damages, punitive damages, attorney fees, the return of any distributions received by Maschmeyer from 2009 through 2014, and the imposition of a constructive trust on real property owned by Maschmeyer, which plaintiffs alleged was purchased using the funds belonging to CRDG.

¶ 14    Count II was a derivative claim on behalf of CRDG against Maschmeyer and Anne Maschmeyer and was for conversion of corporate assets. Count II alleged that Maschmeyer accepted checks payable to CRDG and altered them to add his name as additional payee and then deposited them into his personal bank accounts at Bank of America and Chase Bank. As to Anne Maschmeyer, count II alleged that the Chase Bank account was a joint account and that she knew or should have known that the deposits made into that account rightfully belonged to CRDG. Count II alleged that the funds deposited into the bank accounts were used for personal expenses, including the purchase of real property. Count II requested similar relief as count I, namely, compensatory damages, punitive damages, attorney fees, and imposition of a constructive trust.

¶ 15    Count III was a derivative claim on behalf of CRDG against Maschmeyer and was for fraud. Count III was based on the same conduct set forth in the prior counts and sought compensatory damages, punitive damages, and attorney fees. Count IV was a derivative claim on behalf of CRDG against Maschmeyer and was for an accounting.

¶ 16    Count IV sought a "full accounting of all assets, revenues, expenses, and other finances and management of Chicago Roof Deck, including all monies, expense reimbursements and other payments to Michael Maschmeyer," the imposition of a constructive trust on any assets wrongfully taken from CRDG, and attorney fees.

¶ 17    Count V was a claim for disassociation pursuant to section 35-45 of the Act and alleged that Maschmeyer had engaged in wrongful conduct that had adversely and materially affected CRDG's business and that it was not reasonably practicable for Flynn and Bartosiewicz to

continue to work with him. Accordingly, count V sought a judicial determination ordering Maschmeyer expelled as a member of CRDG, as well as attorney fees.

¶ 18 Finally, count VI[3] was a derivative claim on behalf of CRDG against Bank of America and was for conversion pursuant to section 3-420 of the Uniform Commercial Code (UCC) (810 ILCS 5/3-420 (West 2012)). Count VI alleged that, between September 12, 2011, and May 28, 2014, Maschmeyer presented 117 checks for deposit to his personal checking account at Bank of America, all of which were received from CRDG's customers and payable to CRDG. Count VI alleged that Maschmeyer altered the checks by adding his name onto the payee line of each check and Bank of America accepted these checks and deposited them into Maschmeyer's account. Count VI sought entry of judgment against Bank of America in the amount of the checks, which totaled $502,091.20.

¶ 19 All defendants separately filed answers and affirmative defenses to the amended complaint, and Bank of America also filed cross-claims against Maschmeyer and Anne Maschmeyer. Maschmeyer had also previously filed a counterclaim with respect to plaintiffs' original complaint, which sought the dissolution of CRDG. Additionally, to the extent that Flynn's and Bartosiewicz's actions had caused Maschmeyer to be disassociated with CRDG, the counterclaim sought to have Maschmeyer's interest purchased at fair value pursuant to sections 35-60 and 35-65 of the Act (805 ILCS 180/35-60, 35-65 (West 2012)).

¶ 20 On March 6, 2018, plaintiffs filed a motion for leave to file a second amended complaint, seeking to add as a defendant Urban Rooftops, LLC (the company formed by Maschmeyer and Anne Maschmeyer after leaving CRDG) and seeking to add additional causes of action against the existing defendants. Plaintiffs' proposed second amended complaint added the following counts: (1) a derivative claim against Maschmeyer for tortious interference with contract, (2) a derivative claim against Maschmeyer and Urban Rooftops, LLC, for tortious interference with business expectancy, (3) a derivative claim against Bank of America for breach of contract, (4) a derivative claim against Bank of America for "knowing participation in a fiduciary's breach," and (5) a derivative claim against Anne Maschmeyer for "knowing participation in a fiduciary's breach."

¶ 21 All three defendants filed responses opposing plaintiffs' motion (with the Maschmeyers filing a combined response), noting that the matter was set for trial shortly and that discovery had been ongoing for three years prior to plaintiffs' request to amend. Defendants also claimed that the new counts sought to be added were meritless and that including them on the eve of trial would prejudice them and require discovery to be reopened. On April 9, 2018, the trial court denied plaintiffs' motion for leave to file a second amended complaint.

¶ 22                                                      C. Trial

¶ 23 The matter proceeded to trial on May 29, 2018; trial lasted a total of five days. Plaintiffs called as witnesses (1) Maschmeyer, as an adverse witness, (2) Flynn, (3) Anne Maschmeyer, as an adverse witness, (4) Darius Jankauskas, a bank representative for Bank of America, and (5) Bartosiewicz. Maschmeyer called as witnesses (1) Flynn, as an adverse witness, (2) Bogdan Ponomaryov, principal of Excel Pro, a subcontractor that worked with CRDG, (3) Rafal Leonczuk, principal of Aleon Construction, LLC, another subcontractor that worked with CRDG, and (4) Erin Hollis, Maschmeyer's valuation expert. As noted, many of the facts

_____

[3]This count was incorrectly labeled as another count V in the amended complaint.

are undisputed on appeal, and many others are expressly discussed by the trial court in its order, which we set forth later. Accordingly, while we have considered the entirety of the record on appeal, we discuss only the testimony and evidence relevant to disposition of the issues before us.

### 1. Operating Agreements

The 2009 and 2013 operating agreements governing CRDG were admitted into evidence at trial. As relevant to the instant appeal, section 2.b of the 2013 operating agreement, located under the heading "Capital Contributions," provided:

> "2.b ADDITIONAL CONTRIBUTIONS. Members shall be obligated to make any additional contributions to the Company's capital at written request of Chief Executive Manager. Member's vote exceeds 50% for additional contribution to pass. Additional contribution is due on demand. Non compliance voids any current or past owed distribution to said Member. After thirty (30) day[s] of non compliance, Member to be removed and forfeits any and all rights and or compensation, as Member."

### 2. Guaranty Agreements

Also admitted into evidence were several "Guaranty of Repayment Agreement[s]" between CRDG and Aleon Construction, Excel Pro, and Thomas Wood Craft. Each agreement was substantively the same; the Aleon Construction and Excel Pro agreements were signed by Bartosiewicz on behalf of CRDG, while the Thomas Wood Craft agreement was signed by Flynn (as Bartosiewicz was the principal of Thomas Wood Craft). Each agreement was dated January 28, 2014, and named CRDG as " 'Guarantor' " and the contractor as " 'Contractor.' " The agreement acknowledged that the contractor had performed construction work for the benefit of CRDG in 2012 and 2013 for which it was entitled to payment. The agreement provided that, "[i]n consideration of the work performed by Contractor, Guarantor hereby guarantees repayment of unpaid balance due to Contractor." Additionally, the agreement provided that "Contractor agrees not to file liens on attached addresses or make claims against Guarantor without 90 days prior written notice." The agreement did not contain a deadline in which payment was to be made. Attached to each agreement was a spreadsheet containing columns listing (1) property addresses, (2) dollar amounts for "outstanding," and (3) dollar amounts for "repayment," which were further subdivided into "debt" and "agreement." Similar agreements dated July 29, 2014, and concerning work performed in 2013 and 2014, were also admitted into evidence. Letters from Aleon Construction and Excel Pro dated July 2017 provided that each company had been paid in full for work performed between 2012 and 2014 and that "Repayment agreements from these years are fulfilled."

In testifying about CRDG's debt to him, Ponomaryov testified that he kept records of what CRDG owed him, but that once he was paid on a project he discarded the records. Similarly, Leonczuk testified that, after signing the guaranty agreements with CRDG, he discarded his records of the money owed, as they were no longer needed. Both Ponomaryov and Leonczuk testified that they had received personal checks from Maschmeyer in connection with their work.

### 3. Stipulation Between Plaintiffs and Bank of America

Plaintiffs and Bank of America stipulated to certain facts at trial.[4] While the document containing the stipulation is not included in the record on appeal, both Bank of America's and plaintiffs' pretrial memoranda included a list of facts to which they had agreed to stipulate, which included the following facts. First, CRDG opened a bank account at Bank of America in March 2009, for which Flynn was the sole signatory, and closed the account no later than September 30, 2009. Second, between September 12, 2011, and May 28, 2014, Maschmeyer deposited 118 checks payable to CRDG, totaling $508,091.20, into his personal account. Third, each of these checks were altered by Maschmeyer to add his name on the payee line and that each of these checks was accepted for deposit by Bank of America. Fourth, accepting the checks for payment into Maschmeyer's personal account was inconsistent with Bank of America's internal policies and procedures. Fifth, Flynn appeared at a Bank of America branch in 2013, asked if CRDG had an account there, and was told that it did not; Flynn did not ask if Maschmeyer had an account with Bank of America. Sixth, no maker of a check that Maschmeyer altered provided notice to Bank of America of the alteration of any check prior to August 4, 2014, and Maschmeyer did not inform any Bank of America personnel that he altered any of the checks. Seventh, on August 4, 2014, MB Financial Bank made a demand for return of $14,000 in funds belonging to its customer, which Bank of America had accepted pursuant to a check payable to CRDG and altered by Maschmeyer; Bank of America asked Maschmeyer for his response, and Bank of America ultimately returned the funds to MB Financial Bank.

### 4. Expert Reports

The parties stipulated as to the admissibility of both experts' reports. While Gregg Gaffen, plaintiffs' expert, did not testify at trial, Hollis testified in support of her report.

### a. Gaffen Report

Gaffen's report indicated that he performed an analysis of the "fair market value" of Maschmeyer's ownership interest in CRDG, which was defined as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having knowledge of relevant facts." Gaffen's report further indicated that he used the "discounted cash flow" method of valuation, which was a method used to estimate value based on a projection of financial performance over future periods of time. This method analyzed revenue, expenses, capital investment, working capital needs, capital structure, and required rates of return and, based on the results of the analysis, projected economic cash flow from business operations for future periods of time. That resulting cash flow projection was further discounted at an appropriate present value discount rate to estimate the present value of the future cash flow. In addition, the residual, or terminal, value of the business enterprise was estimated as of the end of the projection period; the terminal value was also discounted to estimate its present value. The present value of the cash flow projected for the period was added to the present value of the terminal value to derive the value of the total invested capital of the business enterprise. Finally, the company's debt and/or other obligations were subtracted

---

[4]The Maschmeyers did not agree to the stipulation.

to estimate the fair market value of the total equity capital. Gaffen's report used this method to project financial performance over a five-year projection period.

¶ 35 Gaffen's report stated that, in compiling the report, he assumed, without independent verification, the accuracy and completeness of all information supplied and that the financial information provided "accurately reflects the results of operations for the Company for the time period covered." Based on that information, Gaffen opined that the fair market value of a 42.5% ownership interest in CRDG was $28,225.

¶ 36 The principal documents relied on by Gaffen were CRDG's internally-prepared financial statements from 2011 through May 30, 2014. CRDG's historical balance sheets showed that (1) total current assets decreased from $138,390 as of December 31, 2011, to $85,794 as of May 30, 2014; (2) "[n]et property, plant and equipment," increased from $0 as of December 31, 2011, to $199,000 as of May 30, 2014; (3) CRDG reported negative shareholders' equity of $550,067; and (4) CRDG reported "outstanding long-term debt" of $1.154 million. With respect to the long-term debt, the report noted that "[w]e understand that this amount represents noninterest-bearing obligations that are past due to various vendors and subcontractors for inventory and work performed." The report further noted that "[w]e further understand that the Company has an additional $946,000 of similar obligations that are not reported on the balance sheet." Additionally, CRDG's historical income statements showed that (1) revenue increased from $2.948 million for 2011 to $4.877 million for the 12-month period ending May 30, 2014; (2) cost of goods sold increased from $2.182 million for 2011 to $3.965 million for the 12-month period ending May 30, 2014; (3) total operating expenses decreased from $841,547 for 2011 to $624,731 for the 12-month period ending May 30, 2014; and (4) net income increased from a loss of $74,623 for 2011 to income of $287,190 for the 12-month period ending May 30, 2014.

¶ 37 Based on discussions with CRDG's management, review of economic and industry conditions, and analysis of past performance, Gaffen estimated that (1) revenue was projected to increase at a compound annual growth rate of 9% to $7.492 million for projected year five, (2) cost of goods sold was estimated to increase from $4.409 million for projected year one to $5.993 million for projected year five, (3) operating expenses were projected to increase from $663,289 for projected year one to $857,039 for projected year five, and (4) debt-free net income was projected to increase from $274,531 for projected year one to $401,057 for projected year five. In applying a present value discount rate, Gaffen calculated that 19.8% was CRDG's weighted average cost of capital.[5]

¶ 38 Gaffen also applied a number of adjustments to the projected cash flow, including projected depreciation expense, projected capital expenditures, and projected increases in operating working capital requirements. Gaffen then estimated a long-term growth rate for the terminal year analysis, and finally, calculated a capitalization rate to estimate the terminal value by subtracting the estimated long-term growth rate from the weighted average cost of capital. Gaffen calculated that 16.8% was the capitalization rate for CRDG.

¶ 39 Based on his analysis, Gaffen opined that the "C corporation equivalent fair market value" of CRDG's total invested capital was $1.845 million. Gaffen noted that, as of the valuation

---

[5]Gaffen's report explained that the weighted average cost of capital "is the weighted average of the required rate of return demanded by equity holders and the required rate of return demanded by debt holders."

date, CRDG reported a note receivable of $319,427, which Gaffen added to the value of total invested capital. Gaffen then subtracted CRDG's reported $1.154 million of long-term debt, and $954,000[6] in off-balance sheet liabilities, to estimate the marketable, noncontrolling value of total equity at $64,400. Gaffen opined that, since CRDG was privately held, it was appropriate to apply a discount for lack of marketability, and determined that 20% was an appropriate discount rate. Accordingly, Gaffen opined that "as of the valuation date, the C corporation equivalent nonmarketable, noncontrolling value of the total equity of CRDG was $51,520." However, since CRDG was not a C corporation but was instead a limited liability company, Gaffen also applied a 1.2890 "S corporation equity adjustment multiple," which was used in the valuation of pass-through entities. That resulted in a "fair market value of total equity on a nonmarketable, noncontrolling ownership interest basis of $66,411." Consequently, a 42.5% ownership interest in CRDG was valued at $28,225.

¶ 40                                        b. Hollis Report

¶ 41        Hollis's report was based on Gaffen's report, but used CRDG's corporate tax returns from 2011 through 2013 instead of its internally-prepared financial statements. Hollis calculated that the difference between the financial statements and the tax returns averaged $393,000 over the three years. According to the tax returns, CRDG's profits reflected positive performance, whereas the financial statements showed a loss in 2011, a slight profit of approximately $75,000 in 2012, and a profit of $203,000 in 2013. In her analysis, Hollis used the $393,000 average difference to calculate an adjustment of $1.514 million to Gaffen's valuation, based on the application of the discounted cash flow method and the underlying assumptions of the projected cash flow used in Gaffen's report. This resulted in a total invested capital value of $3.359 million.

¶ 42        Hollis also discussed the $946,000 " 'off balance-sheet liability' " used in Gaffen's report, opining that the report did not provide sufficient information regarding the liability to substantiate its inclusion in the opinion of value and further opining that the liability was considered to be an " 'extraordinary assumption' " under the Uniform Standards for Professional Appraisal Practice, which should be excluded from the analysis. Hollis added CRDG's note receivable of $319,427 and subtracted CRDG's long-term debt of $1.154 million from the total invested capital value, as Gaffen had. Hollis then added the value of the " 'off balance-sheet liability' " to the equity calculation, which adjusted the marketable, controlling equity value from $64,400 as per Gaffen's report to $2.524 million.

¶ 43        Hollis opined that Gaffen's application of a 20% discount to account for a nonmarketable, noncontrolling total equity value was inappropriate. She noted that CRDG's historical cash flows represented those available to a controlling shareholder "due to the equivalent nature of the two equal 42.5% shareholder's [*sic*] involvement and management of the Company." Hollis further observed that the "fair value" standard of value, which did not apply any discounts, was more appropriate than the "fair market value" standard. Without such a discount, Hollis opined that CRDG's total fair value was $2.524 million. Applying the S corporation economic adjustment multiple of 1.2890, as Gaffen had done, Hollis calculated a fair value of total equity of $3.254 million.

---

[6]Earlier in the report, Gaffen listed this number as $946,000, and his calculations appear to be based on the $946,000 number.

¶ 44     Hollis also included an off-balance sheet asset of $1,130,717 representing a pending litigation asset from the instant litigation. With that asset included, the total fair value of CRDG's equity ownership was $4.385 million, and a 42.5% equity ownership interest was valued at $1.865 million.

¶ 45                        D. Motion for Leave to Amend Complaint

¶ 46     On September 26, 2018, plaintiffs filed a motion for leave to amend their complaint to conform to the proofs at trial by adding a claim against Bank of America for "knowing participation in a breach of fiduciary duty," in which they alleged that Bank of America should have noticed that the checks Maschmeyer deposited had been altered and that its continued acceptance of the checks in obviously questionable circumstances subjected it to liability. In response, Bank of America argued that amendment would be prejudicial and that all of the facts relied on by plaintiffs were known to them well prior to trial. On January 25, 2019, the trial court denied plaintiffs' motion to amend the complaint, finding that "the basis of the second amended complaint [is] all facts and information that the plaintiff had long ago and could have advanced earlier" and further finding that the new claim would fail on its merits.

¶ 47                              E. Trial Court Order

¶ 48     On March 19, 2019, the trial court entered a 27-page judgment order on the parties' claims. As many of the court's findings are at issue on appeal, we discuss them in some depth. As to count I of plaintiffs' complaint, the trial court found that Maschmeyer breached his fiduciary duty to plaintiffs by taking for himself opportunities that belonged to CRDG. The court found unpersuasive Maschmeyer's argument that the jobs he took were ones that CRDG would not have wanted, finding that regardless of Maschmeyer's belief about the desirability of the jobs, as a fiduciary, he was required to disclose and tender the opportunities to CRDG first.[7]

¶ 49     The trial court then considered the appropriate amount of damages for Maschmeyer's breach. The court first found that the uncontroverted evidence established that Maschmeyer deposited into his personal bank account hundreds of checks made payable to CRDG and/or him in the aggregate sum of $1,768,927. The court additionally found that, while he did not receive a salary, Maschmeyer received $976,754 in distributions between 2009 and 2014.

¶ 50     The court found that merely awarding compensatory damages equal to the sum of the checks that Maschmeyer deposited would result in a windfall to CRDG because Maschmeyer incurred expenses in connection with that additional revenue and CRDG would have incurred those same expenses had it taken the jobs. However, the court further found that Maschmeyer had not offered sufficient evidence to quantify the expenses that he had incurred. Consequently, the court found that it was appropriate to award compensatory damages to CRDG in the amount of $1,768,927, the gross revenue generated on the disputed jobs.

¶ 51     The court next considered plaintiffs' request for prejudgment interest, which was permitted in a case for breach of fiduciary duty. The court noted that plaintiffs sought the statutory 9% postjudgment interest rate "as a proxy for a conservative investment rate." The court further noted that plaintiffs sought prejudgment interest from 2009 through the date of judgment. However, the court found that when plaintiffs expelled Maschmeyer from CRDG on July 28,

_____

[7]As noted, Maschmeyer does not challenge this finding on appeal.

2014, they were required to offer to purchase his membership interest. The court found that plaintiffs' failure to do so, and the fact that the value of the interest exceeded the damages for his breach of fiduciary duty, meant that plaintiffs were only entitled to prejudgment interest through the date of Maschmeyer's expulsion. The court further found that the appropriate interest rate was the 5% statutory rate for " 'money received to the use of another and retained without the owner's knowledge' and/or 'money withheld by an unreasonable and vexatious delay of payment.' " (quoting 815 ILCS 205/2 (West 2012)). The court calculated this amount to be $236,350.

¶ 52    Finally, the court considered plaintiffs' request that Maschmeyer forfeit the $976,754 in distributions that he received while he was breaching his fiduciary duty, as well as their request for punitive damages. The court noted that "[w]hile a breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy, such will not always be the case" (citing *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992)). Similarly, the court noted that punitive damages, while permissible, were not automatic. The court found that, "[b]ecause deterrence is the common rationale for forfeiture and punitive damages, the Court views forfeiture as a type of punitive damage and addressed both through the same lens."

¶ 53    The court found that "[t]he circumstances of this case support an award of punitive damages, but not so much as a complete forfeiture of the distributions that Maschmeyer received." The court found that CRDG's business more than doubled between 2010 and 2013, "in substantial part due to Maschmeyer's efforts." The court also found that there was an "opportunistic element to the plaintiffs' case," as the credible evidence showed that Flynn and Bartosiewicz knew that Maschmeyer was performing at least some of the disputed jobs. The court pointed to several checks Maschmeyer wrote to Bartosiewicz from his personal account, as well as checks written to Aleon Construction and Excel Pro. The court also found that the disputed jobs accounted for a substantial volume of business, "making it highly improbable that Flynn and Bartosiewicz were in the dark." The court further noted that Flynn admitted that he did nothing after learning that Maschmeyer was depositing checks that came to CRDG's office at a bank where CRDG did not have an account. Additionally, the court found that because of CRDG's business model, which pursued higher-value local jobs with larger profit margins, "it is highly unlikely that CRDG would have pursued many of the disputed jobs had the opportunities been presented to it." Finally, the court found that, other than the loss of opportunities represented by the disputed checks, plaintiffs "have not offered any credible evidence that Maschmeyer took any other assets of CRDG when he performed the disputed jobs." Balancing this evidence, the court found that an appropriate remedy would be for Maschmeyer to forfeit two-thirds of the distributions he received during the period of time in which he was breaching his fiduciary duty, or $651,104, "as a form and measure of punitive damages, inclusive of attorney's fees."

¶ 54    In sum, on count I of plaintiffs' complaint, the court entered judgment in favor of CRDG and against Maschmeyer in the aggregate sum of $2,656,381, representing (1) compensatory damages of $1,768,927, (2) prejudgment interest of $236,350, and (3) "punitive damages, inclusive of attorney's fee[s]," of $651,104.

¶ 55    With respect to count II of plaintiffs' complaint, for conversion, the court found that the count was duplicative of count I, as it sought the same compensatory damages and equitable relief as in count I. The court further found that the checks that plaintiffs alleged were converted represented the payment that Maschmeyer received for the disputed jobs, meaning

that plaintiffs' claim for conversion was predicted on the same wrongdoing and sought the same amount of damages as their claim for breach of fiduciary duty. Accordingly, because plaintiffs' conversion claim was "redundant," the court entered judgment in favor of Maschmeyer and Anne Maschmeyer on count II. In a footnote, the court also found that there was no basis for the imposition of a constructive trust against the Maschmeyer home "because, after the plaintiffs' judgment against Maschmeyer is setoff against his judgment against CRDG, Maschmeyer will be a judgment creditor and CRDG will be a judgment debtor." Similarly, with respect to count III of plaintiff's complaint, for fraud, the trial court found that, like count II, count III was "indistinguishable from the plaintiffs' breach of fiduciary duty claim." Consequently, the trial court entered judgment in favor of Maschmeyer on count III.

¶ 56    With respect to counts IV and V of plaintiffs' complaint, for an accounting and for the disassociation of Maschmeyer from CRDG, the trial court found that both claims were moot. The court found that plaintiffs had already obtained in discovery any information that an accounting could accomplish and that they had already established an account in their favor relating to the disputed jobs, which there was no indication was incorrect. The court further found that there was no dispute remaining as to Maschmeyer's association with CRDG, since plaintiffs removed him on July 28, 2014, and Maschmeyer did not contest the dissolution.

¶ 57    Turning to Maschmeyer's counterclaim, the trial court found that Maschmeyer was entitled to the fair value of his membership interest in CRDG, as requested in count I of the counterclaim. The court found unpersuasive plaintiffs' contention that Maschmeyer had forfeited his right to the value of his membership interest under section 2.b of the 2013 operating agreement when he failed to honor a capital call for $850,000. The court found that the operating agreement did not authorize a capital call to fewer than all members and that the "capital call" was merely an attempt to have Maschmeyer repay money that Flynn and Bartosiewicz believed he owed CRDG. Accordingly, the court found that Maschmeyer was entitled to the fair value of his membership interest under sections 35-55 and 35-60 of the Act.

¶ 58    The court found that the parties stipulated that the fair value of Maschmeyer's interest was to be calculated as of June 16, 2014. The court then considered the opinions of the parties' experts as to the valuation. The court noted that Hollis, Maschmeyer's expert, opined that the value of Maschmeyer's membership interest, after deducting $1,630,502 in damages in favor of plaintiffs for Maschmeyer's breach of fiduciary duty, was $2,048,081.[8] By contrast, Gaffen, plaintiffs' expert, valued Maschmeyer's membership interest at $28,255. However, before examining the bases of their opinions, the court considered whether CRDG was indebted to its contractors and vendors in the amount of $2,100,288, as plaintiffs contended.

¶ 59    The court noted that plaintiffs claimed that CRDG had $946,000 in " 'off-balance-sheet' liabilities" that were not reflected in its internal financial statements or on any of its tax returns and further claimed another $1,154,000 in " 'long-term' liabilities" that were first reflected on CRDG's 2013 tax return, which Flynn prepared and filed after Maschmeyer was expelled. With respect to the " 'off-balance sheet' liabilities," the court noted that plaintiffs claimed that CRDG owed its contractors—including Thomas Wood Craft, Aleon Construction, and Excel Pro—an aggregate amount of $946,000, which were evidenced by certain guaranties that

---

[8]Hollis's report listed the pending litigation asset as $1.13 million, but she testified at trial that if the judgment against Maschmeyer was increased, then the value of CRDG would also increase correspondingly.

CRDG executed in 2014. The court further noted that Maschmeyer denied that CRDG had any such liabilities and claimed that the guaranty agreements were manufactured by plaintiffs well after their purported dates of execution.

¶ 60    Examining the guaranty agreements, the court first found that, "[b]eginning with the obvious, although called 'guaranty of repayment' agreements, neither Flynn, Bartosiewicz, nor anyone else guaranteed CRDG's obligations to its subcontractors," so the documents were not actually guaranties. Moreover, the court found that the tables attached to each agreement were "incomprehensible" and did not clearly indicate what amount of money CRDG owed its subcontractors. Nor did they state when payment would be made. Additionally, the trial court found that the guaranty agreements were not persuasive evidence of any " 'off-balance sheet' liabilities." The court noted that the agreements purported to have been executed in 2014, but that plaintiffs only produced them in response to Maschmeyer's third request to produce documents in June 2016, not when Maschmeyer originally requested production of documents relating to CRDG's indebtedness in December 2014. The court further noted that plaintiffs did not provide the agreements to Gaffen in 2015 when they engaged him to opine on the valuation of Maschmeyer's interest. Furthermore, the court found that neither Ponomaryov nor Leonczuk, principals of Excel Pro and Aleon Construction, respectively, appeared to have understood the nature of the guaranties they signed and also "[i]nexplicably" discarded documents that evidenced their work and the amounts allegedly guaranteed by CRDG. Finally, the court found that on May 26, 2014, Bartosiewicz wrote a check from CRDG to Excel Pro for $10,000, noting in the memo line that there was a zero balance for 2013, but the July 2014 guaranty signed by Bartosiewicz on behalf of CRDG showed that CRDG owed Excel Pro money under the guaranty agreement for work performed in 2013.

¶ 61    With respect to the $1,154,000 in " 'long-term' liabilities" to CRDG's contractors and vendors, the court found that these debts were not reflected in any of CRDG's contemporaneous financial records that were introduced at trial. The court also commented on Flynn's credibility as a witness in testifying about these debts:

"Flynn was evasive as a witness, particularly when questioned on CRDG's liabilities. After dodging questions concerning where the liabilities were recorded, he finally acknowledged that CRDG maintained an electronic accounts payable ledger, but that he did not produce it to the defendants in discovery. Flynn testified that Maschmeyer 'altered' the ledger, but other than his conclusory statement the plaintiffs offered no evidence that Maschmeyer 'altered' the accounts payable ledger, including what Maschmeyer altered in the ledger, or how Maschmeyer altered the ledger. Nor did the plaintiffs offer any expert testimony to support Flynn' accusation."

The court found that plaintiffs had violated their discovery obligations by not producing the accounts payable ledger to defendants, executing a certificate of completeness under Illinois Supreme Court Rule 214 (eff. July 1, 2014) in May 2018, and not acknowledging the existence of the records "until repeatedly pressed at trial." The court found that "[t]he plaintiffs' discovery violation is reason enough to reject their claim that CRDG is indebted to its subcontractors and vendors in the amount of $2.1 million."

¶ 62    Even leaving aside the discovery violation, the court found that the evidence that plaintiffs offered "was not convincing." The court found:

"Flynn testified that CRDG was constantly in arrears to its subcontractors and vendors, and CRDG owed them $2.1 million. According to the plaintiffs, CRDG owed

- 13 -

Bartosiewicz about $700,000. Bartosiewicz, who had a young family, testified that he could barely keep a roof over his head because CRDG was not paying him. Yet, Bartosiewicz and the other contractors continued to work for CRDG without getting paid, even as CRDG distributed more than $1.75 million to Flynn and Maschmeyer between 2009 and 2014. It defies reason that Bartosiewicz floated such a large receivable, remained in business, and continued to work with CRDG, while Flynn and Maschmeyer each received substantial distributions from CRDG."

The court also found that CRDG's financial books and records were "hopelessly unreliable, odd considering that Flynn has a master's degree in finance and substantial experience in business." The court noted that plaintiffs did not offer any contemporaneous documentary evidence to back up a spreadsheet that Flynn prepared of debts that CRDG owed its contractors and vendors. The court further noted that none of CRDG's income tax records reflected $946,000 in " 'off-balance sheet' liabilities" and that the $1.1 million " 'long-term' indebtedness" "[c]onveniently" first appeared in CRDG's 2013 tax return as a long-term liability, which Flynn prepared and filed after Maschmeyer was expelled. The court noted that the 2012 tax return showed long-term indebtedness of only $395,000 at the end of the year, while the 2013 tax return showed long-term indebtedness of $1,049,382, an "unexplained" difference of $654,382. Finally, the court noted that Flynn submitted loan applications and an alternative version of CRDG's 2013 tax return to financial institutions that did not reflect CRDG's indebtedness and that also reflected higher amounts of income than what CRDG reported to the Internal Revenue Service. The court found: "[i]n sum, because the plaintiffs failed to establish that CRDG was indebted to its subcontractors and vendors in the amount of $2,100,288, the Court excludes such 'liabilities' in determining the fair value of Maschmeyer's membership in CRDG."

¶ 63     Having resolved the issue of CRDG's liabilities, the court then turned to examining the experts' opinions on the fair value of Maschmeyer's membership interest. After discussing each expert's report, the court summarized the differences between Gaffen's and Hollis's opinions. First, Hollis added $1,514,000 in income from CRDG's tax returns that was not reflected in CRDG's internal financial statements. Second, she eliminated $946,000 in " 'off-balance sheet' liabilities." Third, she added a litigation receivable from Maschmeyer to CRDG of $1,130,737. Finally, she eliminated any discount for lack of marketability. The court noted that Hollis testified that if the amount of damages against Maschmeyer were greater than $1,130,737, then it would increase CRDG's value by an equal amount and, therefore, the value of his membership interest.

¶ 64     The court noted that plaintiffs argued that, to the extent that Maschmeyer was entitled to a distributional interest, it should be limited to three years of projected distributable income, or approximately $350,027. Plaintiffs pointed to a comparison Gaffen drew between CRDG and a hypothetical outdoor living company grossing approximately $5 million per year, in which he concluded that such a company's owners could expect to draw distributions of approximately $275,000 per year. They claimed that there was "no 'legal, logical or empirical reason' " to award Maschmeyer more than $350,000 for " 'a business which had a nominal book value and which would not be expected to earn net profits of more than $250,000 a year.' " The court found plaintiffs' argument unpersuasive, noting that plaintiffs "offer no evidence to explain why Hollis'[s] adjustments to Gaffen's opinion of value were inappropriate."

¶ 65 The court found that Hollis's methodology for determining the fair value of Maschmeyer's membership interest in CRDG was "persuasive." However, the court adjusted Hollis's valuation by (1) disallowing $2,100,288 in CRDG's claimed indebtedness to its subcontractors and vendors, (2) setting off the increased litigation asset of $2,005,277, exclusive of punitive damages, and (3) imposing forfeiture as a form of punitive damages against Maschmeyer in the amount of $651,104. The court also found that it would be inequitable to allow Maschmeyer to recapture 42.5% of the punitive damages assessed against him. Thus, it deducted those damages from the net amount due Maschmeyer after setoff of compensatory damages and prejudgment interest due plaintiffs. The court calculated that the fair value of Maschmeyer's interest was $2,867,376, which was offset by the $2,656,381 judgment against him, resulting in a net judgment in favor of Maschmeyer and against CRDG in the amount of $210,995.

¶ 66 Finally, the court addressed count VI of plaintiffs' complaint, for conversion against Bank of America. The court found that, after setting off the judgment against Maschmeyer against the judgment in his favor, Maschmeyer would be left as a judgment creditor and CRDG would be a judgment debtor. The court found that, "[t]hus, the plaintiffs have already recovered their damages on account of the subject checks and any judgment against [Bank of America] would amount to double-dipping, a point they appear to concede." Consequently, the court found that it "need not belabor this decision by reaching [Bank of America's] other defenses."

¶ 67 Plaintiffs' appeal, and Maschmeyer's cross-appeal, follow.

¶ 68           II. ANALYSIS

¶ 69 On appeal, as noted, neither plaintiffs nor Maschmeyer appeals (1) the finding that Maschmeyer breached his fiduciary duty to CRDG, (2) the imposition of punitive damages, or (3) the addition of prejudgment interest to the judgment against Maschmeyer. In their appeal, plaintiffs challenge (1) the grant of judgment in Maschmeyer's favor or, alternatively, the amount of that judgment, (2) the amount of the judgment in CRDG's favor, (3) the dismissal of plaintiffs' other counts, including counts against Anne Maschmeyer and Bank of America, and (4) the denial of plaintiffs' motions for leave to amend their complaint. In his cross-appeal, Maschmeyer challenges the trial court's denial of his requests for interest and attorney fees.

¶ 70 Prior to addressing the merits of the parties' arguments, we note that plaintiffs have filed a motion to strike portions of the Maschmeyers' brief on appeal, which we ordered taken with the case. Specifically, plaintiffs seek to strike portions of their statement of facts that plaintiffs claim are not supported by the record or are overly argumentative. We decline to strike any portion of the Maschmeyers' brief, but consider only those portions of the brief that are supported by the record, as we do any brief. Turning to the merits of the parties' arguments, as an initial matter, we bear in mind that the trial court's order was entered following a bench trial, which included testimony from a number of witnesses and a large amount of documentary evidence. In a bench trial, the trial court has the opportunity to weigh the evidence and make findings of fact, including being in a superior vantage point from which to observe and judge witnesses' demeanor and credibility, while a reviewing court has only a cold record in which to govern its decision-making process. *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107. Consequently, a reviewing court will defer to the factual findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an

opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995). " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 71                    A. Count I of Plaintiffs' Amended Complaint

¶ 72        We first consider plaintiffs' arguments as to the damages award with respect to count I of their amended complaint. As noted, the court entered judgment in favor of CRDG and against Maschmeyer in the aggregate sum of $2,656,381, representing (1) compensatory damages of $1,768,927, (2) prejudgment interest of $236,350, and (3) "punitive damages, inclusive of attorney's fee[s]," of $651,104. On appeal, plaintiffs challenge the trial court's interest and punitive damages awards.

¶ 73                        1. Punitive Damages and Forfeiture

¶ 74        Plaintiffs first claim that the trial court erred in considering punitive damages and forfeiture together and argue that the trial court should have ordered both a complete forfeiture of all of Maschmeyer's distributions and a punitive damage award. In the case at bar, the trial court found that "[b]ecause deterrence is the common rationale for forfeiture and punitive damages, the Court views forfeiture as a type of punitive damage and addresses both through the same lens." In doing so, the court found that an appropriate award would be for Maschmeyer to forfeit only two-thirds of the distributions that he had received from CRDG, which totaled $651,104.

¶ 75        "[W]hen one breaches a fiduciary duty to a principal the appropriate remedy is within the equitable discretion of the court." *Pagano*, 154 Ill. 2d at 190. "While the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy [citation], such will not always be the case." *Pagano*, 154 Ill. 2d at 190. However, several appellate court cases have found that, as a matter of public policy, "a willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the period of the breach." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001); see also *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 58; *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 838 (1980).[9] But see *Monotronics Corp. v. Baylor*, 107 Ill. App. 3d 14, 20 (1982) (finding that the trial court had not abused its discretion in refusing to order full forfeiture). "The purpose of ordering forfeiture of a fiduciary's compensation earned during the period of a breach is not to compensate the injured party but rather to deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty." *Tully*, 409 Ill. App. 3d at 681.

---

[9]We note that the supreme court in *Pagano* cited *ABC Trans National Transport* as its example of when a breach "may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy" (*Pagano*, 154 Ill. 2d at 190). Other cases cited above also trace their citation of this proposition of law back to *ABC Trans National Transport*.

¶ 76        Similarly, "[p]unitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski v. Elliott*, 237 Ill. 2d 51, 57-58 (2010) (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)). They may be awarded "when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). "To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' " *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). However, because they are penal in nature, punitive damages are not favored under the law, and courts must take caution to ensure that they are not improperly or unwisely awarded. *Slovinski*, 237 Ill. 2d at 58.

¶ 77        Punitive damages awards are permitted for a breach of a fiduciary duty. *Tully*, 409 Ill. App. 3d at 670. "The amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions." *Tully*, 409 Ill. App. 3d at 673 (citing *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 69 (2009)). We review the computation of the punitive damages award "to determine whether the amount was excessive or the result of passion, partiality, or corruption." *Gambino*, 398 Ill. App. 3d at 69 (citing *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138 (2004)). "In reviewing [the] determination of the amount of punitive damages, if any, we will reverse only if the award was so excessive [as] to indicate passion, partiality, or corruption." (Internal quotation marks omitted.) *Gambino*, 398 Ill. App. 3d at 69. The assessment of punitive damages is a highly factual decision and, as noted, should be a reflection of the factfinder's determination as to the degree of maliciousness evidenced by a defendant's actions. *Gambino*, 398 Ill. App. 3d at 69.

¶ 78        In the case at bar, we cannot find any error in the trial court's determination that a partial forfeiture of the distributions Maschmeyer had received was appropriate. First, we note that while the trial court was *permitted* to award punitive damages in addition to forfeiture, plaintiffs point to no cases *requiring* a court to award both. See, *e.g.*, *Tully*, 409 Ill. App. 3d at 686 (affirming award of both). Thus, we find no error in the trial court's decision to consider the two issues together and styling the ultimate award as one including punitive damages. Additionally, we cannot find that the trial court's award was either an abuse of discretion or reflected passion, partiality, or corruption.

¶ 79        In its order, the court explained why it determined that a partial forfeiture was appropriate instead of a total forfeiture. The court found that CRDG's business more than doubled between 2010 and 2013, in substantial part due to Maschmeyer's efforts. Additionally, the court found that plaintiffs' actions had an "opportunistic element," finding that Flynn and Bartosiewicz were aware that Maschmeyer was performing at least some of the disputed jobs and that the disputed jobs were ones that it was "highly unlikely" CRDG would have pursued. As noted, "[t]he amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions." *Tully*, 409 Ill. App. 3d at 673 (citing *Gambino*, 398 Ill. App. 3d at 69). We cannot find that the trial court abused its discretion in

- 17 -

balancing these competing factors and determining that Maschmeyer's conduct was not so egregious as to warrant a total forfeiture.

¶ 80    Furthermore, we note that, unlike the cases cited by plaintiffs, here, the forfeiture that they were seeking was not of Maschmeyer's salary, but of his entitled distributions as a member of CRDG. The parties do not dispute that Maschmeyer did not receive a salary, but received only those discretionary distributions that Flynn chose to provide. None of plaintiffs' cited cases that imposed forfeiture involved such a situation. Instead, they concerned forfeiture of compensation. We thus cannot find that the trial court erred in finding that it would be inappropriate to award plaintiffs the entire amount of those discretionary distributions as a punitive damages award.

¶ 81    Finally, plaintiffs take issue with the trial court's statement that it was awarding $651,104 "as a form and measure of punitive damages, inclusive of attorney's fees." Plaintiffs argue that, if the trial court was going to consider their attorney fees as part of the punitive damages award, it should have permitted them to file a fee petition to establish the amount of their attorney fees. However, this argument has been forfeited, as plaintiffs did not raise it before the trial court and did not seek to file a petition for attorney fees below. It is well settled that arguments that are raised for the first time on appeal are forfeited. *Pajic v. Old Republic Insurance Co.*, 394 Ill. App. 3d 1040, 1051 (2009). Consequently, we affirm the trial court's $651,104 punitive damages award.

¶ 82                                    2. Prejudgment Interest

¶ 83    Plaintiffs also challenge the trial court's award of $236,350 in prejudgment interest, contending that the trial court should have applied a 9% rate instead of the 5% rate that it applied and that it should have applied prejudgment interest through the date of the judgment order, not simply through the date or Maschmeyer's *de facto* dissociation. Prejudgment interest is proper when authorized by statute, provided by agreement of the parties, or warranted by equitable considerations. *Tully*, 409 Ill. App. 3d at 684-85. "The rationale underlying an equitable award of prejudgment interest in a case involving a breach of fiduciary duty is to make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989). The injured party is thereby compensated for any economic loss caused by the inability to use his money. *Wernick*, 127 Ill. 2d at 87. "Prejudgment interest in this context acts as a concept of fairness and equity and not as a sanction against the defendant." *Wernick*, 127 Ill. 2d at 87.

¶ 84    In awarding prejudgment interest due to equitable considerations, the amount of interest allowed "need not fall within any precise terms." *Wernick*, 127 Ill. 2d at 87. Whether equitable considerations support an award of interest is a matter lying within the sound discretion of the trial court, and such a determination will not be disturbed on review unless it constitutes an abuse of discretion. *Wernick*, 127 Ill. 2d at 87.

¶ 85    In the case at bar, the trial court determined that plaintiffs were entitled to prejudgment interest and set the interest rate at the 5% rate set by the Interest Act for "money received to the use of another and retained without the owner's knowledge" and "money withheld by an unreasonable and vexatious delay of payment." 815 ILCS 205/2 (West 2012). Plaintiffs, however, argue that they were instead entitled to the statutory 9% interest rate set by the Code

of Civil Procedure for postjudgment interest. 735 ILCS 5/2-1303 (West 2012). We do not find this argument persuasive.

¶ 86    Plaintiffs claimed below that a 9% investment rate was "a proxy for a conservative investment rate over the relevant time" and that a 5% rate was insufficient in a breach of fiduciary duty case. However, plaintiffs did not present any evidence as to the appropriate interest rate, such as showing that they could have invested the money at a higher rate. See, *e.g.*, *Tully*, 409 Ill. App. 3d at 685 (affirming an award of 13% prejudgment interest where the plaintiffs showed that the defendant had lent money at a 13% interest rate). They merely pointed to a statement in *Wernick* in which the supreme court declined to apply the statutory prejudgment interest rate because it found that it did not provide an accurate measure of compensation for money wrongfully withheld. See *Wernick*, 127 Ill. 2d at 87-88.[10] Instead, the *Wernick* court found that the plaintiffs were entitled to an award of interest at the prime rate. *Wernick*, 127 Ill. 2d at 88.

¶ 87    In their reply brief, plaintiffs point this court to the Dow Jones Industrial Average, which they claim shows that the annual investment rate of return was over 33% between January 2009 and March 2019. However, this was not an argument made before the trial court. Plaintiffs presented no evidence, or even argument, as to why 9% was an appropriate rate other than the conclusory statements discussed above. Plaintiffs also offer no evidence, or even argument, that the rate they calculated using the Dow Jones Industrial Average bears any relation to the rate of return they could have received with the funds improperly held by Maschmeyer. As noted, the trial court is not limited to any particular rate in determining prejudgment interest, and we will not overturn its decision absent an abuse of discretion. *Wernick*, 127 Ill. 2d at 87. Here, we cannot find any such abuse of discretion in the trial court's determination that plaintiffs were entitled to 5% interest on their damages award.

¶ 88    We also can find no abuse of discretion in the trial court's decision to award prejudgment interest only through the date of Maschmeyer's *de facto* dissociation in July 2014. The award of prejudgment interest "acts as a concept of fairness and equity and not as a sanction against the defendant." *Wernick*, 127 Ill. 2d at 87. In the case at bar, the trial court found that plaintiffs had failed to offer to purchase Maschmeyer's membership interest after expelling him, as required, and the trial court used that date as the stopping point for the prejudgment interest award. We can find no error in its decision that an equitable remedy would cease at the point at which plaintiffs engaged in improper conduct.

---

[10]We note that, at the time of the *Wernick* decision, as noted by the supreme court, the statutory interest rate had not been changed for nearly a century. *Wernick*, 127 Ill. 2d at 87-88 ("Over the past century, *** the statutory rate for prejudgment interest has not been changed to reflect the escalating interest rates in the market."). At the time of the 1985 trial court judgment in that case, the prime interest rate was 10.5%. JPMorganChase & Co., *Historical Prime Rate*, https://institute.jpmorganchase.com/about/our-business/historical-prime-rate (last visited June 10, 2020) [https://perma.cc/JR5G-8CCA]. Section 2 of the Interest Act was amended in 1998, but the interest rate was not changed and remains 5% today. 815 ILCS 205/2 (West 2018). The prime interest rate between 2009 and 2014 was 3.25%. JPMorganChase & Co., *Historical Prime Rate*, https://institute.jpmorganchase.com/about/our-business/historical-prime-rate (last visited June 10, 2020) [https://perma.cc/JR5G-8CCA].

- 19 -

¶ 89                                   3. Individual Claims

¶ 90        Plaintiffs' final argument concerning count I is that the trial court erred in not addressing damages suffered by Flynn and Bartosiewicz individually. Count I was brought by Flynn and Bartosiewicz, individually as well as on behalf of CRDG, and alleged that Flynn and Bartosiewicz were personally damaged because they "have lost the fair value and ongoing income from their interest in Chicago Roof Deck, among other damages." However, the trial court entered judgment in favor of only CRDG on count I and dismissed Flynn's and Bartosiewicz's individual claims without separately addressing them. We review the issue of whether the trial court properly dismissed these claims *de novo*. See *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 745-46 (2009) (whether a shareholder has standing to file suit in an individual capacity rather than derivatively is subject to *de novo* review). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 48.

¶ 91        A derivative lawsuit "is the standard vehicle by which shareholders may seek relief for wrongs done to a corporation, and a shareholder may not bring suit in an individual capacity to obtain redress on behalf of the corporation for wrongs done to the corporation." *Davis v. Dyson*, 387 Ill. App. 3d 676, 689 (2008). An exception to this rule allows a shareholder with a "direct, personal interest" in a cause of action to bring suit even if the corporation's rights are also implicated. *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 62 (2002). However, the shareholder must allege something more than a wrong to the corporate body. *Davis*, 387 Ill. App. 3d at 689. "Rather, for a shareholder to have standing to bring an individual claim, the shareholder must allege an injury that is 'separate and distinct from that suffered by other shareholders,' or an injury that involves a contractual right that exists independently of any corporate right." *Davis*, 387 Ill. App. 3d at 690 (quoting *Caparos v. Morton*, 364 Ill. App. 3d 159, 167 (2006)).

¶ 92        In the case at bar, plaintiffs claim that Flynn and Bartosiewicz were personally damaged by Maschmeyer's conduct. However, their claims as individuals are identical to their claims on behalf of CRDG. Indeed, in the amended complaint, they group all three claims into one count and seek identical relief. Flynn and Bartosiewicz attempt to distinguish their claims from those of CRDG by claiming that they were deprived of distributions and that Bartosiewicz was deprived of payment for work performed by Thomas Wood Craft. However, those claims are merely the same claims made by CRDG wearing a slightly different hat. We thus cannot find that it was error for the trial court to determine that the relief awarded would be directed to CRDG instead of to Flynn and Bartosiewicz individually.

¶ 93              B. Judgment on Count I of Maschmeyer's Counterclaim

¶ 94        Plaintiffs next claim that the trial court erred in entering judgment in Maschmeyer's favor on count I of his counterclaim, which sought the fair value of Maschmeyer's interest in CRDG. Plaintiffs claim that Maschmeyer forfeited his right to the fair value of his interest by failing to heed the "capital call" in 2014 and, alternatively, that if Maschmeyer was entitled to receive the value of his interest, the trial court erred in calculating the amount of that interest.

¶ 95                                      1. Capital Call

¶ 96        Plaintiffs first claim that Maschmeyer forfeited his right to any distributional interest by failing to respond to their June 26, 2014, letter demanding $850,000 as a "capital request."

Plaintiffs claim that the language of the 2013 operating agreement clearly establishes that, by failing to respond, Maschmeyer forfeited his rights.

¶ 97    As relevant to the instant appeal, section 2.b of the 2013 operating agreement, located under the heading "Capital Contributions," provided:

> "2.b ADDITIONAL CONTRIBUTIONS. Members shall be obligated to make any additional contributions to the Company's capital at written request of Chief Executive Manager. Member's vote exceeds 50% for additional contribution to pass. Additional contribution is due on demand. Non compliance voids any current or past owed distribution to said Member. After thirty (30) day[s] of non compliance, Member to be removed and forfeits any and all rights and or compensation, as Member."[11]

¶ 98    The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004). " '[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). A court interpreting a contract begins by examining the language of the contract alone and "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill. 2d at 462 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991)). The interpretation of a contact involves a question of law, which we review *de novo*. *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011). As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Goldberg*, 2012 IL App (1st) 110620, ¶ 48.

¶ 99    In the case at bar, the trial court determined that the June 26, 2014, letter was not a capital call, as it was not made on all of CRDG's members, but was instead a demand for repayment of the funds that Flynn and Bartosiewicz believed that Maschmeyer owed. Plaintiffs argue that this finding was improper, as the language of the operating agreement did not require capital calls to be made on all members. We do not find this argument persuasive.

¶ 100   As the trial court found, section 2.b of the operating agreement "is not artfully drafted." However, we agree with its conclusion that a proper capital call under the agreement was required to be made upon all members, not directed solely at one member. The beginning of the provision provides that "[m]embers" shall be obligated to make additional contributions to CRDG's capital at the written request of the chief executive manager. The provision later specifies that noncompliance "voids any current or past owed distribution to said Member." The use of the plural when discussing the making of the capital call, especially where contrasted with the later use of the singular, suggests that the request made by the chief executive manager is to be made on all members, not just one. We find no error in the trial court's interpretation of the language.

¶ 101   We cannot agree with plaintiffs that Flynn's discretion to make distributions changes the interpretation of section 2.b. The fact that Flynn had the ability to decide the amount and timing of distributions in no way suggests that he was entitled to demand that a particular member

---

[11]We have reproduced the language of the operating agreement as it appears in the agreement. Any grammatical errors appear in the original.

provide additional capital to CRDG or forfeit those distributions. Similarly, the fact that it only required 50% of the members to approve a capital call in no way alters the conclusion that, when such a call was to be made, it was required to be made on all members.

¶ 102    Plaintiffs also suggest that CRDG's method of operations shows that Flynn and Bartosiewicz had "implicitly" supplied at least their share of the capital call. However, none of the "implicit[ ]" contributions were made in connection with the "capital call" on Maschmeyer. The fact that Flynn and Bartosiewicz may have made different contributions in different ways over the years has no relevance to the particular capital call at issue.

¶ 103    Finally, we note that the trial court made a factual finding that the purpose of the letter to Maschmeyer was merely an attempt to recover the $850,000 that Flynn and Bartosiewicz believed that Maschmeyer had improperly received. In fact, the trial court found that Flynn had been impeached by his deposition testimony at trial and admitted that, even if Maschmeyer had made the $850,000 payment, the balance in his capital account would not have increased. We will not second-guess this factual finding as to the intent of the letter and the trial court's conclusion that the letter did not represent a true "capital call" under the operating agreement. Accordingly, we cannot find that Maschmeyer forfeited his right to his distributional interest in CRDG.

¶ 104                          2. Value of Maschmeyer's Interest

¶ 105    Plaintiffs also argue that, even if Maschmeyer was entitled to the value of his interest in CRDG, the trial court erred in calculating that value. At the time at issue, the Act provided that "[u]pon a member's dissociation the company must cause the dissociated member's distributional interest to be purchased under Section 35-60." 805 ILCS 180/35-55(a) (West 2012). [12] Section 35-60 provided that a limited liability company "shall purchase a distributional interest of a member for its fair value determined as of the date of the member's dissociation if the member's dissociation does not result in a dissolution and winding up of the company's business." 805 ILCS 180/35-60(a) (West 2012). [13] Section 35-65 of the Act provided that, in an action to determine the fair value of a distributional interest, the court shall "determine the fair value of the interest, considering among other relevant evidence the going concern value of the company, any agreement among some or all of the members fixing the price or specifying a formula for determining value of distributional interests for any other purpose, the recommendations of any appraiser appointed by the court, and any legal constraints on the company's ability to purchase the interest." 805 ILCS 180/35-65(a)(1) (West 2012).

¶ 106    In the case at bar, the trial court examined the reports of the parties' experts and largely adopted the valuation presented by Hollis, which it found persuasive. However, the trial court disallowed certain claims of indebtedness and made other adjustments to the valuation to conclude that the fair value of Maschmeyer's distributional interest was $2,867,376. An

[12]This section has since been amended to remove the quoted language. See 805 ILCS 180/35-55 (West 2018). The parties do not dispute that the preamendment version governs the instant litigation.

[13]Section 35-60 has since been repealed, as has section 35-65, which provides standards for the trial court to apply in valuing the interest. See Pub. Act 99-637 (eff. July 1, 2017) (repealing 805 ILCS 180/35-60, 35-65). Again, the parties do not dispute that sections 35-60 and 35-65 are applicable to the instant litigation.

appellate court will defer to the judgment of the trial court regarding property valuation unless the trial court's decision was against the manifest weight of the evidence. *In re Estate of Lambrecht*, 375 Ill. App. 3d 865, 871 (2007). As noted, "[a] decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. In the instant case, we cannot find that the trial court's decision was against the manifest weight of the evidence.

¶ 107    Plaintiffs first claim that the "litigation asset" representing the judgment against Maschmeyer (exclusive of the punitive damages award) should not have been included in the calculation of Maschmeyer's interest because it violated public policy in rewarding Maschmeyer for breaching his fiduciary duties. However, the amount of the judgment represents CRDG's assets, and its inclusion is necessary in order to represent the company's full value. Maschmeyer is already required to pay back the money he improperly earned from the disputed jobs. Excluding it from a calculation of CRDG's value would, in effect, award the money a second time to plaintiffs. We cannot find that it was against the manifest weight of the evidence for the trial court to decline to do so. We also find unpersuasive plaintiffs' contention that this money should not be considered an asset, as most of the money that came in to CRDG was spent on materials and labor. The trial court in the case at bar awarded CRDG the gross revenues from the checks Maschmeyer received because it found that he did not substantiate the amount of the expenses, despite its acknowledgment that Maschmeyer surely incurred expenses in performing the disputed jobs. Thus, CRDG was actually awarded more than Maschmeyer received in profits, and we find no merit in its suggestion that these funds were improperly included as an asset.

¶ 108    Plaintiffs next take issue with the trial court's use of Hollis's report, suggesting that her addition of $393,000 in income from 2011 through 2013 (resulting in an adjustment of $1.514 million to Gaffen's valuation) represented a "fundamental misunderstanding" of the basis of Gaffen's valuation. Plaintiffs claim that Gaffen's report was based on a forecast of future revenues and expenses, not the income reflected on CRDG's financial statements. However, plaintiffs ignore the fact that Gaffen's report states that part of determining that forecast involved considering CRDG's past financial records. We thus cannot find that the court's inclusion of this $1.514 million was against the manifest weight of the evidence. We also find unpersuasive plaintiffs' challenges to Hollis's opinions based on the lack of foundation for those opinions, as the record clearly demonstrates that both experts used the same methods of valuation and Hollis explained the basis for her adjustments to Gaffen's valuation.

¶ 109    Plaintiffs also argue that the trial court erred in excluding the $1.154 million in long-term indebtedness that was included by both experts in their valuation. Plaintiffs argue that they presented "substantial and uncontradicted evidence that [CRDG] owed its vendors more than $1,000,000, including its 2013 tax return [citation] and the Guaranty Repayment Agreements." We do not find this argument persuasive. The trial court was clear that Flynn's testimony was not credible with respect to CRDG's finances. He was "evasive," and the evidence presented by plaintiffs was "not convincing." The court also found that the debts were not reflected in any of CRDG's contemporaneous financial records and that plaintiffs did not provide any contemporaneous documentary evidence to back up a spreadsheet prepared by Flynn of debts that CRDG owed its contractors and vendors. Indeed, the court specifically found CRDG's financial books and records to be "hopelessly unreliable," which was "odd" considering

Flynn's financial and business background. The court also found that Flynn had submitted loan applications and an alternative version of CRDG's 2013 tax return to financial institutions that did not reflect this indebtedness. With respect to the guaranty agreements, the trial court determined that they were "not persuasive evidence" of CRDG's indebtedness, since (1) there were problems with the content of the agreements, (2) the signors to the agreements did not understand them, (3) the proof of the underlying debts had been destroyed, (4) the contemporaneous checks signed by Bartosiewicz suggested that there was a zero balance with Excel Pro, and (5) the agreements were first produced in 2016 when they were purportedly executed in 2014 and were not even provided to plaintiffs' valuation expert. As a result, there is a plethora of plaintiffs' evidence that the trial court did not find credible, and we will not second-guess the trial court's credibility determinations. Accordingly, it was not against the manifest weight of the evidence for the trial court to disallow this "debt" in valuing CRDG, and we affirm its valuation of Maschmeyer's interest in CRDG.

¶ 110                                    3. Interest and Attorney Fees

¶ 111    In his cross-appeal, Maschmeyer argues that, in its judgment in his favor on his counterclaim, the trial court was required to consider his request for prejudgment interest and attorney fees. Maschmeyer's claims are based upon the requirements of section 35-65 of the Act and, as such, are reviewed *de novo*. See *Wilkins v. Williams*, 2013 IL 114310, ¶ 13 (review of the interpretation of a statute is *de novo*). Under section 35-65 of the Act, in a court action to determine the fair value of a dissociated member's distributional interest, "[i]nterest must be paid on the amount awarded from the date determined under subsection (a) of Section 35-60 to the date of payment," 805 ILCS 180/35-65(e) (West 2012). In the case at bar, the trial court's order was silent on the issue of interest. Under the plain language of section 35-65(e), Maschmeyer was entitled to an award of prejudgment interest. Accordingly, we remand to the trial court to determine an appropriate award of interest. We find unpersuasive plaintiffs' claim that interest is not required because the instant action was not "an action to determine the fair value of a distributional interest in a limited liability company," so section 35-65 does not apply. The parties and the trial court relied on section 35-65 in valuing Maschmeyer's interest in CRDG. Moreover, Maschmeyer specifically raised sections 35-60 and 35-65 in his counterclaim. Consequently, we find that the provisions of section 35-65 govern and, here, require the award of prejudgment interest.

¶ 112    With respect to attorney fees, section 35-65 provides that,

> "[i]f the court finds that a party to the proceeding acted arbitrarily, vexatiously, or not in good faith, it may award one or more other parties their reasonable expenses, including attorney's fees and the expenses of appraisers or other experts, incurred in the proceeding. The finding may be based on the company's failure to make an offer to pay or to comply with Section 35-60." 805 ILCS 180/35-65(d) (West 2012).

In the case at bar, the trial court did not make a finding that plaintiffs acted arbitrarily, vexatiously, or not in good faith, and we accordingly find no error in its denial of Maschmeyer's request for attorney fees. We find unpersuasive Maschmeyer's contention that the issue was not considered by the trial court; the court's order provided that all claims not discussed were "dismissed." Consequently, we presume that the trial court considered all of the claims before it and chose to deny Maschmeyer's request. We therefore affirm the trial court's judgment in that respect.

¶ 113                              C. Other Counts of Plaintiffs' Complaint

¶ 114        Plaintiffs next claim that the trial court erred in finding their claims of fraud and conversion
to be duplicative, and in finding their claim against Bank of America to be moot.

¶ 115                                    1. Fraud and Conversion

¶ 116        The trial court found that count II, for fraud, and count III, for conversion, were duplicative
of count I. "A duplicative count may be properly dismissed." *Nagy v. Beckley*, 218 Ill. App. 3d
875, 879 (1991). We review such a dismissal *de novo*. See *Nagy*, 218 Ill. App. 3d at 878. In
the case at bar, as the trial court found, counts II and III were predicated on the same claims of
wrongdoing as count I and sought the same compensatory damages and equitable relief as
sought in that count. Accordingly, the trial court did not err in dismissing them.

¶ 117        Plaintiffs claim that their fraud count was predicated on different evidence than that of their
breach of fiduciary duty claim. However, the court found that claims concerning
Maschmeyer's conduct with respect to a prior business venture with Flynn had not been
included in plaintiffs' amended complaint and declined to consider them. Plaintiffs argue that
they were not required to plead all of their trial evidence in their complaint. However, while a
plaintiff is not required to set out evidence, it is required to allege the ultimate facts to be
proved. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 348 (2003). We agree with the
trial court that it was not required to consider a theory that had not previously been pleaded in
plaintiffs' complaint.[14]

¶ 118                                 2. Count Against Bank of America

¶ 119        Finally, plaintiffs contend that the trial court erred in entering judgment in favor of Bank
of America on count VI, for conversion. However, plaintiffs' argument is based on a
fundamental misunderstanding of the trial court's order. Plaintiffs claim that

> "the trial court failed to analyze or adjudicate Plaintiffs' conversion claim against BofA
> because it ultimately found that [Maschmeyer] had no obligation to return any of the
> misappropriated monies which he converted through altered endorsements; and,
> further, if [Maschmeyer] had no liability to the Plaintiffs, then BofA had no ultimate
> liability to make Plaintiffs' [*sic*] whole for the monies that it helped [Maschmeyer]
> convert."

This is not what the trial court did.

¶ 120        The trial court specifically found that the judgment against Maschmeyer for breach of
fiduciary duty based on the checks for the disputed jobs would be set off by the value of
Maschmeyer's membership interest in CRDG. In other words, while Maschmeyer owed
CRDG for his breach of fiduciary duty, the funds to pay for that judgment would first come
from the amount CRDG owed Maschmeyer for his membership interest. Since the value of the
membership interest was greater, Maschmeyer would be left as a judgment creditor and CRDG
would be left as a judgment debtor. Because CRDG would have recovered all of the damages

---

[14]Plaintiffs also point to testimony by Bartosiewicz about statements that Maschmeyer had made
to him suggesting that Thomas Wood Craft would be made current. Again, plaintiffs' complaint was
based on Maschmeyer's failure to disclose his work on the disputed jobs, not based on any affirmative
representations, and the trial court was not required to consider a new theory at trial.

to which it was entitled from Maschmeyer, plaintiffs would no longer have any basis for recovery from Bank of America.

¶ 121    "The determination of damages is generally left to the trier of fact, and a reviewing court will not lightly substitute its opinion for that of the trier of fact." *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 196-97 (2003) (citing *Barton v. Chicago & North Western Transportation Co.*, 325 Ill. App. 3d 1005, 1042 (2001)). However, "courts in Illinois have long recognized the legal principle that a plaintiff shall have only one satisfaction for an injury [citations], irrespective of the availability of multiple theories that recovery for the injury can be sought under." *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 558 (1980). In the case at bar, because plaintiffs were awarded a judgment in their favor on count I of their amended complaint, they could no longer pursue Bank of America for the same judgment.

¶ 122    Plaintiffs appear to suggest that the fact that they will not walk away from the lawsuit with the judgment award somehow changes this principle. It does not. This litigation concerns two overarching issues: (1) whether Maschmeyer acted improperly and (2) the value of Maschmeyer's interest in CRDG. While they contain some overlap, they are largely two separate issues subject to two separate analyses. Plaintiffs prevailed on the first issue. They received a judgment in their favor, comprising all of the damages to which they were entitled, including payment for the $502,091.20 in checks that were deposited with Bank of America. Maschmeyer prevailed on the second issue, in that he received a judgment reflecting the value of his membership interest. The fact that the amount of this second judgment happens to exceed the amount of the first judgment in no way renders the first judgment any less complete. Plaintiffs cite no authority that has ever found that to be the case, and we do not find their argument persuasive. Consequently, we cannot find any error in the trial court's determination that plaintiffs had already received a full recovery and there was no longer any available recovery from Bank of America.

¶ 123                    D. Motions for Leave to Amend Complaint

¶ 124    Finally, plaintiffs challenge the trial court's denial of their motions for leave to amend their complaint, once immediately before trial, and once after trial. Section 2-616(a) of the Code of Civil Procedure provides that amendments to complaints may be allowed at any time before judgment, on just and reasonable terms. 735 ILCS 5/2-616(a) (West 2016). The decision to allow an amendment to a pleading rests within the sound discretion of the trial court, and we will not reverse the trial court's decision absent an abuse of that discretion. *Axion RMS, Ltd. v. Booth*, 2019 IL App (1st) 180724, ¶ 26. "A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court." *Axion RMS*, 2019 IL App (1st) 180724, ¶ 26. To determine whether a trial court has abused its discretion, we look to the four factors set out by our supreme court: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 125    In the case at bar, plaintiffs first sought leave to file a second amended complaint on March 6, 2018, seeking to add as a defendant Urban Rooftops, LLC (the company formed by Maschmeyer and Anne Maschmeyer after leaving CRDG) and seeking to add additional causes of action against the existing defendants. Plaintiffs' proposed second amended complaint

- 26 -

added the following counts: (1) a derivative claim against Maschmeyer for tortious interference with contract, (2) a derivative claim against Maschmeyer and Urban Rooftops, LLC, for tortious interference with business expectancy, (3) a derivative claim against Bank of America for breach of contract, (4) a derivative claim against Bank of America for "knowing participation in a fiduciary's breach," and (5) a derivative claim against Anne Maschmeyer for "knowing participation in a fiduciary's breach."

¶ 126 We cannot find that it was an abuse of discretion for the trial court to deny plaintiffs' motion. Plaintiffs filed their motion nearly three years after the filing of their amended complaint, after voluminous discovery, and a month before the scheduled trial date. Plaintiffs' proposed complaint also would have added a number of claims, including the addition of a new defendant, and would have required discovery to be reopened with respect to those claims. Consequently, we cannot find that it was an abuse of discretion for the trial court to deny plaintiffs leave to amend their complaint.

¶ 127 Similarly, we cannot find that it was an abuse of discretion for the trial court to deny plaintiffs leave to amend their complaint after trial to add a claim against Bank of America for "knowing participation in a breach of fiduciary duty." The trial court found that "the basis of the second amended complaint [is] all facts and information that the plaintiff had long ago and could have advanced earlier" and further found that the new claim would fail on its merits. "Amendments during or on the eve of trial should not ordinarily be permitted if such amendments concern matters which the pleader knew at the time the original pleading was filed and for which the pleader offers no good reason for not having pleaded the matter in the original pleading." *First National Bank & Trust Co. of Evanston v. Sousanes*, 66 Ill. App. 3d 394, 396 (1978). Accordingly, we cannot find that the trial court's decision was an abuse of discretion.

¶ 128                                        III. CONCLUSION

¶ 129 For the reasons set forth above, we affirm the trial court's judgment in all respects, other than remanding to the trial court for the limited purpose of determining the appropriate prejudgment interest to be awarded to Maschmeyer for his membership interest pursuant to section 35-65 of the Act.

¶ 130 Affirmed in part and reversed in part, remanded with instructions.