2024 IL App (1st) 221694

Nos. 1-22-1694 & 1-22-1730 (cons.)

Order filed March 11, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RM 1534 S. WESTERN, LLC, as Assignee of Lakeside Bank, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2018 CH 13550 |
| | ) | |
| THE MUSIC ZONE REHEARSAL STUDIOS, L.L.C., | ) ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| RM 1534 S. WESTERN, LLC, as Assignee of Lakeside Bank SPE, LLC, Peterson Cicero, | ) ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| (1600 Western Venture, LLC, | ) | |
| | ) | |
| Plaintiff-Intervenor-Appellant, | ) | |
| | ) | |
| RM 1534 S. Western, LLC, | ) | The Honorable |
| | ) | Marian E. Perkins, |
| Defendant-Intervenor-Appellee). | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.

Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

## ORDER

¶ 1    *Held*:   The trial court erroneously entered a consent judgment of foreclosure and denied implied easements over the property in question.

¶ 2    This case involves a complicated history between two adjacent properties: (1) 1534 S. Western Avenue in Chicago (the North Property), and (2) 2444 West 16th Street (the South Property). Both were owned by 1600 Western Venture, LLC, (1600 Western) for 15 years. The North Property, however, was subject to a mortgage with Lakeside Bank. When that mortgage went into default, 1600 Western issued a deed in lieu of foreclosure to Lakeside Bank's subsidiary, Lakeside SPE, LLC Peterson Cicero (Lakeside SPE) (collectively, the Lakeside Parties). Over the course of the litigation before us, the Lakeside Parties later agreed to a consent judgment of foreclosure.

¶ 3    Meanwhile, for decades, tenants of the South Property's building had used portions of the North Property to park and to access the South Property's loading docks. One such tenant, Music Zone Rehearsal Studios, L.L.C. (Music Zone), held a lease to park on the North Property. Additionally, both Music Zone and 1600 Western claimed implied easements over the North Property for the benefit of the South Property. Further complicating matters, the Lakeside Parties conveyed their interests as mortgagor and mortgagee of the North Property to RM 1534 S. Western, LLC (RM), during this litigation. The trial court ultimately determined that the consent judgment extinguished Music Zone's lease and that neither Music Zone nor 1600 Western held implied easements over the North Property. Music Zone and 1600 Western now appeal.

¶ 4    For the following reasons, we (1) vacate the consent judgment of foreclosure, (2) reverse the denial of the implied easements; and (3) remand for further proceedings consistent with those determinations. We affirm the trial court's judgment in all other respects.

2

¶ 5                                    I. Background

¶ 6                                  A. The Properties

¶ 7      The record shows that the South Property is improved by a commercial, industrial building that was constructed around 1860, and has been owned by 1600 Western since its inception in 1994. In 2000, 1600 Western purchased the North Property as well, although 1600 Western never had the two properties officially converted into a single parcel. The North Property was then placed in a trust, for which Lakeside Bank became the trustee. Lakeside Bank, as trustee and mortgagor with respect to the North Property, entered into a mortgage agreement with itself as mortgagee in June 2004. Although the North Property had tenants at one point, the City of Chicago (City) closed the building during 1600 Western's ownership of the property.[1]

¶ 8      Most of the South Property is occupied by its commercial building. Railroad tracks border the west side of the property, and Western Avenue borders the east side. In addition, 16th Street borders the south side, and a driveway connects 16th Street to a small parking lot on the east portion of the South Property (Small Lot). To the north of the South Property, a 16-foot-wide public alley runs between the South Property and the North property. As for the North Property, a building sits on the northern portion, leaving an open, cement-covered space on the southern portion.

¶ 9      Crucial to this dispute, individuals from the South Property have been parking in the open space on the North Property as well as on the alley itself (Big Lot) since before 1600 Western acquired either property. While the building on the South Property has several docks, the building's only functional docks are located on the north side of the building (Functional Docks) and abut the alley. Immediately to the east of the Functional Docks, a stairway entrance as well

_____

[1] The City and 1600 Western also entered into an agreed order enjoining it from doing any construction on the property without the City's permission.

as the building's sole disability ramp extend into the alley, as does an out-of-service dock. Furthermore, a couple of the aforementioned stairs extend onto the North Property. The result is that individuals from the South Property drive across a portion of the North Property to access the South Property's Functional Docks.

¶ 10                                    B. Change of Ownership

¶ 11     In 2014, Lakeside Bank filed a complaint to foreclose upon the mortgage on the North Property (2014 CH 18732). Lakeside Bank and 1600 Western then entered into a "Forbearance, Loan Modification and Deed-in-Lieu of Foreclosure Agreement" (Forbearance Agreement). The parties' differing interpretations of this agreement's terms have been the fodder for much contentious litigation. Among other things, the parties continue to dispute whether the mortgage was extinguished when 1600 Western, and other obligors not at issue here, complied with the terms of the Forbearance Agreement. Suffice it to say, the agreement, at a minimum, released 1600 Western from personal liability for the mortgage debt and led 1600 Western to issue a deed in lieu of foreclosure for the North Property to Lakeside SPE in 2015. Lakeside SPE then purported to step into 1600 Western's shoes as the mortgagor of the property. Furthermore, 1600 Western instructed Music Zone, which had possessed a lease to park in the Big Lot since 2012, to submit rent checks to Lakeside Bank.[2] Lakeside Bank also sent 1600 Western a "1099-C: cancellation of debt" letter for the 2015 tax year. The letter stated that $1,265,534.92 in commercial mortgage debt was discharged. We note that the initial principal amount secured by the mortgage was $1,675,000.

¶ 12                                    C. The Present Foreclosure Litigation

_____

[2] While Music Zone possessed two lease agreements pertaining to the Big Lot, we refer to them as one for the sake of simplicity.

¶ 13    On October 30, 2018, Lakeside Bank filed, against Lakeside SPE and Music Zone, the complaint for mortgage foreclosure at issue in this appeal. The bank alleged that the loan was in default, leaving $2,422,484.74 due and owing. The bank further stated that it had offered the owner of the property, Lakeside SPE, the satisfaction of all indebtedness secured by the Mortgage, without judicial sale, in exchange for a consent judgment of foreclosure, which would vest title in Lakeside Bank free and clear of all rights of Lakeside SPE and others. See 735 ILCS 5/15/1402 (West 2018).

¶ 14    Music Zone then filed a motion to dismiss the foreclosure complaint (735 ILCS 5/2-619(9) (West 2018)), initially contesting whether the Big Lot was actually part of the North Property. On January 22, 2019, Lakeside Bank and Lakeside SPE, represented by the same counsel, filed a motion for the entry of a consent judgment of foreclosure, supported by an attached stipulation. The Lakeside Parties also attached a proposed consent judgment, stating that Music Zone had "not objected to the entry of this Consent Judgment," despite Music Zone's motion to dismiss. Lakeside Bank responded to the motion to dismiss the same day.

¶ 15    On July 2, 2019, the trial court entered a written order denying Music Zone's motion to dismiss, finding that Music Zone's lease was junior to the mortgage, and entering a consent judgment, subject to the pending question of whether the Big Lot fell within the North Property.[3] The court also ordered Music Zone to file an answer or affirmative defenses, but apparently intended such pleadings to be limited to the question of the property boundaries. The court did not enter the proposed order drafted by the Lakeside Parties.

---

[3] A hearing on Music Zone's motion to dismiss occurred on March 21, 2019. The transcript of that hearing, however, is not included in our record on appeal.

¶ 16    In an order entered on July 16, 2019, the trial court elaborated on the prior order but reached the same conclusions. Unfortunately, that order misstated that "Paragraph 11 of the Consent Foreclosure Stipulation," as opposed to paragraph 11 of the proposed consent judgment, represented that Music Zone had not objected to the entry of the consent judgment and, thus, its interests were foreclosed. The parties dispute the significance of this error.

¶ 17    Music Zone then filed an answer and affirmative defenses to the foreclosure complaint, notwithstanding that the trial court had already entered the consent judgment of foreclosure. Specifically, Music Zone denied that the loan was in default or that the North Property continued to secure the loan. Music Zone also asserted as an affirmative defense that there was no actual controversy or justiciable foreclosure lawsuit because Lakeside Bank was effectively foreclosing upon itself. In its second affirmative defense, Music Zone asserted that Lakeside Bank was estopped from denying the validity of Music Zone's lease to park in the Big Lot because the bank had accepted Music Zone's rent checks. Music Zone asserted a third affirmative defense claiming an easement by necessity not only to park, but to cross the Big Lot to access the South Property's Functional Docks. Music Zone subsequently filed a fourth affirmative defense alleging that the Forbearance Agreement extinguished the mortgage, leaving nothing to foreclose.

¶ 18    Lakeside Bank moved to strike Music Zone's affirmative defenses, arguing that the trial court had "already decided all of the major issues," leaving only the question of whether the Big Lot fell within the foreclosed property. As for the claimed easement, Music Zone had also failed to argue that it lacked another reasonable means of ingress and egress. The bank further disputed that the Forbearance Agreement extinguished the mortgage.

¶ 19     In its response to that motion, Music Zone argued that the trial court entered the consent judgment before Music Zone had been given the opportunity to answer the complaint and file affirmative defenses. In addition, the IRS form 1099-C that Lakeside Bank had sent 1600 Western for the 2015 tax year showed that the debt was cancelled.

¶ 20                                    C. RM Purchases the North Property

¶ 21     Meanwhile, RM purchased both Lakeside Bank's and Lakeside SPE's interests in the North Property on August 26, 2019. Thus, assuming that the mortgage had survived the Forbearance Agreement, RM was now both mortgagor and mortgagee. Lakeside Bank instructed Music Zone to direct rent payments for the Big Lot to RM going forward.

¶ 22     On October 4, 2019, Music Zone filed a combined motion for (1) leave to withdraw its answer and amended affirmative defenses, (2) to dismiss the complaint under section 2-615 (735 ILCS 5/2-615 (West 2018)) for failure to name a necessary party, *i.e.*, RM, and (3) to impose sanctions (Ill. S. Ct. R. 137 (eff. Jan. 1, 2018)) for Lakeside Bank's failure to inform the court that it no longer owned the North Property. Music Zone's motion noted that Lakeside Bank's vice president had executed the deed to RM on Lakeside SPE's behalf. We also note that counsel for the Lakeside Parties began representing RM as well.

¶ 23     On October 11, 2019, RM, through said counsel, filed a motion for an order substituting RM for Lakeside Bank as plaintiff and for Lakeside SPE as defendant. Thus, RM sought to be both plaintiff and defendant in this action.

¶ 24     Music Zone objected, arguing that RM "cannot foreclosure a non-existent mortgage against itself." Music Zone argued that under the merger doctrine, the mortgage was extinguished when one entity became both the party bound to pay the obligation and the party entitled to receive that same obligation. See *Olney Trust Bank v. Pitts*, 200 Ill. App. 3d 917, 925

7

(1990) (stating "the doctrine of merger provides that when the same person who is bound to pay is also entitled to receive, there is an extinguishment of rights, such that debtor and creditor become the same person and there can be no right to put in execution"). Furthermore, Music Zone argued that because there was no longer a controversy with respect to the mortgage, the case should be dismissed. Music Zone later filed a supplemental objection to RM's motion to substitute, arguing that a single entity cannot be both plaintiff and defendant in the same action.

¶ 25    In support of the motion to substitute, RM and Lakeside Bank argued that no merger of interests occurred because the trial court entered the consent judgment before RM acquired the interests of the Lakeside Parties. The response of RM and Lakeside Bank to Music Zone's combined motion presented the same argument.

¶ 26    In Music Zone's reply supporting its combined motion, it argued that the consent judgment was interlocutory, not final, and thus, the merger doctrine did apply. See *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 11 (stating "that a judgment ordering the foreclosure of mortgage is not final and appealable," as "it does not dispute of all issues between the parties and it does not terminate the litigation"); *Catlett v. Novak*, 116 Ill. 2d 63, 68 (1987) (stating that an interlocutory order can be reviewed, vacated or modified at any time prior to final judgment); 735 ILCS 5/15-1103 (West 2018) (stating that "[t]he authority of the court continues during the entire pendency of the foreclosure and until disposition of all matters arising out of the foreclosure"). In contrast, RM's reply in support of its motion for substitution argued it would be inequitable and unconscionable to suggest that it could not intervene in litigation concerning its own property.

¶ 27    On March 5, 2020, a hearing was held on (1) Music Zone's combined motion; (2) Lakeside Bank's motion to strike Music Zone's affirmative defenses; and (3) the motion to

substitute. The trial court denied Music Zone's combined motion in its entirety, struck its affirmative defense of easement by necessity without prejudice, and struck its remaining affirmative defenses with prejudice. The court also granted the motion to substitute RM for the Lakeside Parties. The court further ordered an evidentiary hearing to be held solely on the issues of whether the Big Lot fell within the North Property and whether Music Zone possessed an easement by necessity to access the Big Lot. Shortly thereafter, Music Zone refiled its easement by necessity defense, asserting that it needed access to the Big Lot in order to reach the South Property's Functional Docks and to park. RM later filed an answer to Music Zone's affirmative defense, denying that access to the Big Lot was required for use of the South Property.

¶ 28                                    D. Motion to Reconsider

¶ 29    On July 16, 2020, Music Zone filed a motion to reconsider several of the court's rulings. Among other things, Music Zone argued that the consent judgment entered exactly one year earlier mistakenly suggested that Music Zone did not object to the foreclosure. Because the court denied Music Zone's motion to dismiss at the same time that it entered the consent judgment, Music Zone was also denied the opportunity to file an answer raising substantive matters that would create factual issues. In addition, the motion challenged the lack of adversity between the Lakeside Parties, the continued existence of the mortgage and RM's ability to be both mortgagor and mortgagee, plaintiff and defendant. The trial court denied Music Zone's motion to reconsider on December 7, 2020. The written order does not contain the court's reasoning, however, and the transcript from that date is not included in our record on appeal.[4]

¶ 30                                    E. 1600 Western Intervenes

_____

[4] Shortly thereafter, the court denied Music Zone's request for a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 31     In May 2021, 1600 Western intervened and filed a complaint seeking a declaration that it held an easement by necessity over the North Property to access the South Property's Functional Docks. RM disagreed and raised an affirmative defense alleging that 1600 Western, through the Forbearance Agreement, contractually waived the right to claim an easement.

¶ 32                               F. Trial

¶ 33     Before trial, RM and Music Zone entered into joint factual stipulations. They stipulated, among other things, that Music Zone held a lease to use the parking lot and provided the court with several exhibits, including a plat survey of the property. Although 1600 Western was not a party to those stipulations, it is now undisputed that the Big Lot fell within the North Property, as stipulated to by RM and Music Zone. A bench trial commenced on June 23, 2021.[5]

¶ 34     Matthew Howe, the prior manager of Special Assets for Lakeside Bank, testified that he was personally involved in the creation of the Forbearance Agreement. While he intended for 1600 Western to waive any rights to the North Property, they never discussed whether 1600 Western intended to have continued access to the North Property. He did not attempt to restrict Music Zone's subsequent use of the North Property either. Howe received rent checks from Music Zone, but recalled sending them back.

¶ 35     Pater Cacciatore, one of RM's owners, testified that 1600 Western had owned both the North and South Property, and had "operated as one big piece of property." For three or four years, he had seen the South Property's tenants or employees park in the Big Lot. He did not know how many years cars had been parking in that lot, but he was aware of it at the time he

---

[5] Before briefing of this appeal, Music Zone and 1600 Western filed a motion to supplement the record with trial transcripts. We denied that motion, as the transcripts attached were not certified by the clerk of the circuit court. Notwithstanding that ruling, the transcripts appear in our record as attachments to other pleadings. Absent any objection from RM, we find it appropriate to consider those transcripts in this instance.

became interested in buying the North Property. When RM purchased the property, he knew it was subject to a dispute. Cacciatore further testified that although the North Property's building was presently vacant, RM could not develop the property up to the lot line if cars continued parking there. RM had had architectural renderings made for development.

¶ 36     According to Cacciatore, one could access the South Property through the driveway off of 16th Street or the alley extending from Western Avenue to the train tracks. Initially, Cacciatore testified that if cars were not in the alley, it was possible to drive straight down the alley from Western to the train tracks. He subsequently testified, however, that the South Property's Functional Docks as well as the staircase to the east of those docks extended into the alley and a couple of stairs encroached onto the North Property.

> "Q. So at this point it's your testimony that presently we could not drive a truck
> down the alley, is that correct?
>
> A Well, you got to go all the way to the staircase, and then you'd have to stop,
> right."

He concluded that the stairs were illegally built on the alley and that the Functional Docks could be accessed through the alley if 1600 Western moved the staircase. Furthermore, Cacciatore knew of no reason why 1600 Western could not use the dock located in the Small Lot.

¶ 37     Brian Flisk, 1600 Western's manager, testified that the South Property had 10 commercial or industrial tenants. Over 100 people worked in the  building on a daily basis and parked in the Big Lot. When 1600 Western owned both the North Property and the South Property, 1600 Western used the Big Lot not only for parking but to access its Functional Docks. Nothing changed when the North Property was transferred to Lakeside Bank. Some people parked in the Small Lot, which had only 25 parking spaces, but most parked in the Big Lot, the only realistic

place to park. Food truck tenants also used the Small Lot. Additionally, the tenants of the South Property had been permitted to park in the Big Lot even before 1600 Western owned the South Property, and no one had ever put up a sign saying otherwise. Flisk acknowledged that at some point, however, Howe sent a letter stating that 1600 Western's tenants were not to park in the Big Lot. Flisk challenged Howe and no subsequent attempt was made to prevent the tenants from parking there, although there were back and forth conversations about it.

¶ 38    As for the building's docks, Flisk testified that the out-of-service dock in the Small Lot on the east side of the building was too steep to be used and, in any event could only be used by one tenant because it did not connect to the rest of the building. There was another old dock appendaged to the north side of the building, behind the stairway, but it was not used either; rather, the Functional Docks to the west of the stairway and disability ramp were the only ones that could accommodate a vehicle as large as a UPS truck. Flisk further testified that the stairway on the north side of the building had been there for at least 60 years, and the disability ramp was installed in that staircase in 1997 to comply with the Americans With Disabilities Act. Flisk acknowledged that the prior owners of the South Property did not provide him with a permit with respect to the staircase and that no permit was acquired to construct the ramp. That being said, the City regularly inspected the South Property and never objected to the ramp or to the cars parked on the alley. Flisk testified that without the Functional Docks and the Big Lot, the South Property could not function.

¶ 39    Joseph Hibbs, Music Zone's owner, testified that his customers had been parking in the Big Lot since his business was established in 1996. No one had attempted to obstruct their use of the lot. Additionally, food trucks parked in the Small Lot. Unless he was able to find parking elsewhere, his business could not function without the Big Lot. As for the parking lease, Howe

cashed a few of the rent checks Hibbs sent him, but then started sending them back. Hibbs later sent rent checks to RM, but they were neither cashed nor returned.

¶ 40    Hibbs further testified that the musicians, artists and woodworkers who rented rooms from Music Zone required use of the Functional Docks for their equipment. In addition, the South Property's tenants had been using the Functional Docks on the North side of the building since at least 1996. Due to the stairway and an older out-of-service dock blocking the alley, however, one had to drive onto the North Property to access the Functional Docks. Specifically, one had to enter the 16th Street driveway, turn left into the public alley, turn right toward 15th street and then back into the Functional Docks. Hibbs did not know if the dock on the east side of the South Property was usable, but Music Zone could not use it in any case because it did not connect to his part of the building. Hibbs also explained that while there were four doorways to the building, the individual doorways did not connect to the entire building.

¶ 41    Four other tenants of the South Property testified as well: a furniture manufacturer, the executive director of Chicago Women in Trades, the owner of a commercial, decorative-lighting company, and the manager of a kitchen and cleaning supply distribution company. Their collective testimony essentially showed that use of the Functional Docks on the North Side of the building was required to send in or out furniture, lumber, construction materials, welding equipment historic lighting and other materials. The dock on the east side of the building would not be functional due to its slant.

¶ 42    Their collective testimony also showed that approximately 50 employees from their businesses, as well as additional customers and students, parked in the Big Lot. Chicago Women in Trades in particular needed a well-lit parking lot for the safety of its employees and students attending evening classes. In addition, no one had told them they could not park in the Big Lot

and the Small lot was insufficient. If they could not park in the Big Lot, there would be nowhere else to park: no parking was permitted on Western, and the parking on 16th Street was occupied by Cinespace. Without access to the Functional Docks and parking in the Big Lot, their businesses would not survive.

¶ 43                                  G. The Trial Court's Ruling

¶ 44    On June 27, 2022, the trial court entered an order finding that the Big Lot fell within the North Property, that the mortgage foreclosure judgment extinguished Music Zone's lease, and that neither Music Zone nor 1600 Western had proven by clear and convincing evidence that they were entitled to an implied easement over the North Property. The court did not, however, rule on RM's affirmative defense asserting that 1600 Western waived the right to seek an easement due to the Forbearance Agreement. The court further stated that an opinion and memorandum would be filed on July 1, 2022.

¶ 45    When an opinion and memorandum was not filed by that date, Music Zone and 1600 Western filed a combined posttrial motion, reiterating several of its previous arguments. The motion also argued that the court failed to explain its conclusion that Music Zone and 1600 Western did not show an entitlement to an easement.

¶ 46    Subsequently, on August 4, 2022, the trial court entered a written opinion and memorandum reiterating the conclusions set forth in the June 27th order. As to the easement, the court found that Flisk testified that the two properties were never part of a single piece of land. In addition, Cacciatore testified that the alley separating the two properties could be used to access the South Property. We note that at times, the opinion suggested that the question was whether the South Property's tenants and employees had *the means* to access the Big Lot, as opposed to whether they had *a right* to park in the Big Lot in the first instance. For example, the opinion

14

stated that "separate parcels of land were divided by a public alley way which also provides an *alternative way* for the musicians, women, truck drivers, and persons with disabilities *to access the North Parking Lot* and the loading dock." (Emphases added.) Similarly, the court stated that "[m]embers of the public can access the North Parking Lot \*\*\* through the nearby City of Chicago public alleyway."

¶ 47    Music Zone and 1600 Western then filed posttrial motions arguing that the court had misread the survey and that even Cacciatore had testified that a vehicle traveling through the alley would have to stop at the staircase that blocked access to the Functional Docks. In response, RM argued, among other things, that Music Zone and 1600 Western were not entitled to easements because the North Property and South Property were never a single parcel of land. Following a hearing, the trial court entered a written order denying the post-trial motions. The transcript of that hearing is not included in our record on appeal.

¶ 48                                            II. Analysis

¶ 49    On appeal, Music Zone and 1600 Western raise several challenges the court's judgment.[6] As a threshold matter, however, RM argues that 1600 Western, through the Forbearance Agreement, expressly waived its right to raise any challenge to RM's right to the property.[7] See *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 327 (2004) (stating that

---

[6] We note that every one of the seven briefs filed in this case suffers from deficiencies, some more than others, and there are too many deficiencies to identify them all in this decision. Specifically, the briefs all contain violations of Illinois Supreme Court Rule 341(h) (Oct. 1, 2020). Some are riddled with typos. Others take great liberties in reciting the trial testimony or the arguments of their adversaries. Additionally, some briefs erroneously rely on unpublished decisions. Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). We strongly encourage the attorneys before us to take greater care in future appeals.

[7] The Forbearance Agreement stated that "Obligors \*\*\* agree that they shall not interfere with or oppose Lender in or to the recording of the Deeds, or in proceedings to quiet title or perfect Lender's right, title and interest in or to the Properties, in any action to foreclose any of the Mortgages."

"[w]aiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right").

¶ 50    In response, 1600 Western argues that the Forbearance Agreement expired in November 2017, that all obligations imposed upon 1600 Western were released under the agreement when 1600 Western fulfilled the agreement's conditions, and that the trial court never addressed this issue. The latter point is well taken. RM has cited no support for the suggestion that it would be appropriate for this court to rule on RM's contractual waiver defense in the first instance. Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020); *Andrews v. At World, LLC*, 2023 IL App (1st) 1220950, ¶ 30 n.6 (recognizing that the appellate court is not a repository into which the parties may dump the burden of research or argument). Accordingly, we decline to find contractual waiver under these circumstances.

¶ 51                              A. *Res Judicata* & Collateral Estoppel

¶ 52    1600 Western asserts that the trial court erroneously denied Music Zone's motion to dismiss this case because the 2014 mortgage case resulted in *res judicata* or collateral estoppel. Similarly, 1600 Western asserts that the trial court erroneously struck Music Zone's affirmative defense alleging that the 2014 foreclosure litigation barred the present litigation.[8]

¶ 53    We note that 1600 Western states on appeal that "[t]he elements for invoking *res judicata* and collateral estoppels [*sic*] are well established *and require no elaboration here*." (Emphasis added.) As for the latter proposition, Rule 341(h)(7) and an appellant's duty to provide well defined issues compel us to disagree.

_____

[8] We question whether 1600 Western has standing to challenge the denial of another party's pleading. RM has similarly suggested in a conclusory footnote that 1600 Western lacked standing to raise several assertions on appeal. RM, however, has failed to develop a cohesive argument in this regard. In addition, standing, is a component of justiciability and may be forfeited or waived. See *Rowe v. Raoul*, 2023 IL 129248, ¶ 22. Because RM has failed to develop a cohesive argument, RM has forfeited any potential challenge to 1600 Western's ability to raise this and other assertions on appeal.

¶ 54     In any event, *res judicata* requires (1) a final judgment on the merits by a court of competent jurisdiction, (2) identity of the cause of action, and (3) identity of the parties or their privies. *American Freedom v. Garcia*, 2021 IL App (1st) 200231, ¶ 41. Similarly, collateral estoppel applies where (1) an issue decided in prior litigation is identical to the issue in the present case; (2) the issue was decided in a final judgment on the merits; and (3) the party to be estopped was a party in the prior adjudication or in privity with such a party. *Id.* ¶ 42.

¶ 55     1600 Western suggests that the Forbearance Agreement in conjunction with the dismissal of the 2014 foreclosure case constitutes a final judgment on the merits. That agreement provided that 1600 Western would be released from all obligations under the loans accompanying the mortgage upon the completion of certain events, including the payment of the amount owed to Lakeside Bank.[9] According to 1600 Western, the IRS Form 1099-C sent to 1600 Western for the 2015 tax year stated that $1,265,534.92 in commercial mortgage debt was discharged, demonstrating that the mortgage had been extinguished.

¶ 56     We find that 1600 Western has failed to develop an argument addressing how its reading of the relied upon release provision can be read harmoniously with another provision of the Forbearance Agreement specifying that Lakeside SPE's acceptance of the deed to the North Property would not result in a merger of Lakeside Bank's interests under the loan into its interest

---

[9] "Notwithstanding anything in this Agreement to the contrary. Lender shall release Obligors of each and every of their obligations with respect to the Loans, upon the last of the following conditions to occur: (1) Lender receives the Owner's Title Policies to all Properties, subject only to the Permitted Exceptions, it being understood that all outstanding real estate taxes owed on the Properties shall become the responsibility of Lender upon its acceptance and recording of the Deeds; (2) Obligors deliver and Lender receives the $100,000.00 payment contemplated in Section 2,1,2 above; and (3) Obligors repay to Lender the full amount of the Overdrafts prior to the expiration of the Forbearance Period." The Forbearance Agreement also stated that the trial court's dismissal of the 2014 action without prejudice "shall convert to 'with prejudice' upon the expiration of the Forbearance Period, but only if no Forbearance Default has occurred under this Agreement."

as fee holder of the North Property.[10] See *Olney Trust Bank*, 200 Ill. App. 3d at 924-25 (stating "the doctrine of merger provides that when the same person who is bound to pay is also entitled to receive, there is an extinguishment of rights" but observing that the Code of Civil Procedure (Ill.Rev.Stat.1987, ch. 110, par. 15–1401) specifies that a deed in lieu of foreclosure does not create a merger); see also 735 ILCS 5/15-1401 (West 2014).

¶ 57    Even assuming 1600 Western's reading of the Forbearance Agreement is correct, it cites no authority supporting the proposition that the IRS form constitutes irrebuttable proof that the agreement's terms have been satisfied and that the mortgage has been extinguished. *In re Estate of Hoffer*, 2015 IL App (3d) 140542, ¶ 22 (stating that IRS Form 1099-C is not itself a means of discharging a debt); *Nationstar Mortgage, LLC, v. Nordgren*, 2023 IL App (2d) 220332-U, ¶ 30 (stating that section 2 of the Mortgage Act (765 ILCS 905/2 (West 2020)) is the only method of releasing a mortgage and reiterating that IRS form 1099-C is not a method for discharging a debt).

¶ 58    Accordingly, we find no error.

¶ 59                                  B.    Consent Judgment

¶ 60    Next, 1600 Western asserts that the trial court erroneously entered the consent judgment of foreclosure because Music Zone did not consent, and the court's judgment stated otherwise.

---

[10] "The acceptance of the Transfer Documents and Acceptance of the Deeds by Lender shall not: (i) result in a merger of the interest of Lender pursuant to the Loan Documents into the interest of Lender as fee holder of such portion or all of the Properties and as owner of the personalty; (ii) be deemed a waiver by Lender of any claim of priority pursuant to the Mortgages or other Loan Documents over any other liens, mortgages, security interests or encumbrances of any kind or nature, now existing or hereafter placed upon the Properties, or any part thereof; or (iii) affect or prejudice in any way the right of Lender to foreclose any of the Mortgages by judicial proceedings or otherwise or to proceed as provided in the Loan Documents and as otherwise provided at law or in equity in the event that other liens, mortgages, security interests or encumbrances, resulting from the act or deed of Obligors, shall be asserted against any of the Properties. The Notes and Loan Documents and the liens imposed thereby shall, in all respects, survive the recording and acceptance of the Deeds, and in this connection. Obligors hereby ratify and confirm the Notes and Loan Documents in all respects."

RM responds that the court properly entered the consent judgment and clearly recognized that Music Zone did not consent. Additionally, the court's mistaken citation to RM's proposed order stating that Music Zone had not objected did not demonstrate that Music Zone was actually prohibited from objecting.

¶ 61    We need not address the parties' arguments regarding whether the trial court did or did not recognize that that Music Zone was objecting to the entry of the consent judgment. The more important question is whether that judgment was properly entered without Music Zone's consent under these circumstances. RM has failed to address this issue.

¶ 62    Section 15-1402 of the Code of Civil Procedure governs consent judgments of foreclosure. See *In re Application of Skidmore*, 2018 IL App (2d) 170369, ¶ 10 (stating that compliance with a statute constitutes a matter of statutory construction, which we review *de novo*). Subsection (a) states, in pertinent part, as follows:

> "In a foreclosure, the court shall enter a judgment satisfying the mortgage indebtedness by vesting absolute title to the mortgaged real estate in the mortgagee free and clear of all claims, liens *** and interest of the mortgagor, *** and of all rights of all other persons made parties in the foreclosure whose interests are subordinate to that of the mortgagee *** *if* at any time before sale:
>
> > (4) *no *** party*, by answer or by response to the motion or stipulation, within the time allowed for such answer or response, *objects to the entry of such judgment*; and
>
> > (5) upon notice to all parties who have not previously been found in default for failure to appear, *answer* or otherwise plead." (Emphases added.) 735 ILCS 5/15-1402(a) (West 2018).

19

Thus, the plain language of subsection (a)(4) generally requires that no party objects to the entry of a consent judgment of foreclosure. We also observe that subsection (a)(5) contemplates that parties will be permitted to file an answer. This is consistent with a defendant's general right to file an answer. See *Trusler v. Sears, Roebuck & Co.*, 125 Ill. App. 3d 325, 328 (1984) (stating that "[t]he option of filing an answer in a civil cause is a matter of right," and that "[a] motion to dismiss is not the equivalent of an answer"); *Bank of America, N.A. v. 108 N. State Retail, LLC*, 401 Ill. App. 3d 158, 171 (2010) (stating that the filing of a motion to dismiss did not preclude the subsequent filing of an answer and it would have made little sense to file both at the same time).

¶ 63     If a party other than the mortgagor does object, section 15-1402(b) applies:

> "If any party other than a mortgagor who then has an interest in the mortgaged real estate objects to the entry of such judgment by consent, the court, after hearing, shall enter an order providing either:
>
> (1) that for good cause shown, the judgment by consent shall not be allowed; or
>
> (2) that, *good cause not having been shown by the objecting party and the objecting party not having agreed to pay the amount required to redeem in accordance with subsection (d) of Section 15-1603, title to the mortgaged real estate be vested in the mortgagee as requested by the mortgagee and consented to by the mortgagor; or*
>
> (3) determining the amount required to redeem in accordance with subsection (d) of Section 15-1603, finding that the objecting party *** has agreed to pay such amount and additional interest under the mortgage accrued to the date

of payment within 30 days after entry of the order[.]" (Emphasis added.)735 ILCS 5/15-1402(b) (West 2018).

Accordingly, where a party has objected, the court may enter a consent judgment of foreclosure only by entering an order specifying that the objecting party has not shown good cause and did not agree to pay the amount to redeem the property. See Nichols ILCP §125:8. We also find this presupposes that an objecting party be given the adequate opportunity to show good cause.

¶ 64    Here, the trial court entered the consent judgment over Music Zone's objection. The court did not, however, make a finding that Music Zone failed to show good cause and declined to redeem the North Property. Music Zone was not permitted to file an answer to the mortgage complaint either. Rather, the court entered the consent judgment on the same date that it denied Music Zone's motion to dismiss and rejected Music Zone's subsequent attempt to file an answer. Because the court did not comply with section 15-1402 when it entered the consent judgment, we vacate that judgment and remand for further proceedings.

¶ 65                                                    C. Collusion

¶ 66    1600 Western also asserts that that the trial court erroneously entered a consent judgment because Lakeside Bank and Lakeside SPE were acting in collusion. Specifically, the same counsel represented plaintiff Lakeside Bank, the mortgagee, and defendant Lakeside SPE, the mortgagor and, thus, the parties were not adversarial. See also Ill. R. Prof. Conduct, R.1.7 (eff. Jan. 1, 2010) (stating that a conflict of interest may be waived if, among other things, "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal"). In response, RM, who also shares counsel with the Lakeside Parties, argues that there was a clear adversity between the parties.

¶ 67    "Our supreme court has made clear that agreed judgments entered into through litigation that is not truly adversarial but collusively brought for the purpose of having such a judgment entered by a court of law are presumed to be collusive and fraudulent and may be challenged as void by adversely affected third parties." *Litvak v. Black*, 2019 IL App (1st) 181707, ¶ 24 (citing *Green v. Hutsonville Township High School District No. 201*, 356 Ill. 216, 221-22 (1934)). Where the facts show that a lawsuit was adversarial only in form and the resulting judgment resulted from the parties' tacit consent, an inference arises that the judgment was both collusive and fraudulent. *Litvak*, 2019 IL App (1st) 181707, ¶ 24.

¶ 68    Here, the relationship between Lakeside Bank, Lakeside SPE and their mutual counsel was questionable. During his testimony, Howe, the prior manager of Lakeside Bank, referred to the bank, as opposed to Lakeside SPE, as the owner of the North Property, treating them as one in the same. In addition, RM has not addressed 1600 Western's argument that the presence of any adversity between the Lakeside parties was negated by their decision to share counsel. As between the Lakeside Parties, we reject RM's assertion that there was clear adversity.

¶ 69    That being said, an adversarial relationship certainly exists between Music Zone and 1600 Western on the one hand, and the Lakeside Parties and RM on the other. Furthermore, the consent judgment statute on its face requires that there be a certain level of cooperation between the mortgagor and mortgagee. 1600 Western has not addressed how the principles discussed in *Litvak* coexist with this statute. In any event, we have already determined that the consent judgment must be vacated, and 1600 Western has identified no further relief to be had from finding that that judgment was collusive. Accordingly, we need not resolve this assertion.

¶ 70    Curiously, RM also states on appeal that "1600 Western suggests that there was no 'adversity' between the parties in this litigation because Lakeside Bank had sold the Western

Avenue Property to RM 1534 following the entry of the foreclosure judgment." Indeed, Music Zone argued in the trial court that when RM stepped into the shoes of both the mortgagor and the mortgagee, the mortgage was extinguished. *See also Olney Trust Bank*, 200 Ill. App. 3d at 925 (stating that when the person who is bound to pay is the same person who is entitled to receive, "there is an extinguishment of rights, such that debtor and creditor become the same person and there can be no right to put in execution"); *Access Realty Group, Inc. v. Kane*, 2019 IL App (1st) 180173, ¶ 22 (similar). Yet, that is a separate matter from whether collusion occurred between Lakeside Bank and Lakeside SPE. On appeal, neither 1600 Western nor Music Zone have raised the issue of merger resulting from RM becoming both mortgagor and mortgagee with respect to the North Property. Accordingly, we need not consider it.

¶ 71                                    D.       Music Zone's Lease

¶ 72    Music Zone further asserts that the trial court improperly dismissed its affirmative defense alleging that RM's acceptance of rent checks following entry of the consent judgment of foreclosure estopped RM from denying the continued validity of Music Zone's lease to park on the Big Lot. In response, RM argues that estoppel does not apply as Music Zone's lease rights were not extinguished until August 5, 2022, when the trial court ruled that the parking lot fell within the Western Avenue Property's boundaries. Thus, RM's acceptance of checks before that date did not result in estoppel.

¶ 73    In light of our determination that the consent judgment must be vacated, it follows that Music Zone's lease has not been extinguished, rendering it unnecessary for us to consider this assertion. Because this matter is likely to arise on remand, however, we briefly observe that the parties stipulated at trial that Music Zone had a valid lease over the Big Lot. In addition, that lease was not extinguished when the consent judgment of foreclosure was entered, as it did not

23

become a final judgment until all matters in the case were resolved. See *EMC Mortgage Corp.*, 2012 IL 113419, ¶ 11. Consequently, it is irrelevant whether RM accepted checks from Music Zone prior to that time. *Cf. Midland v. Helgason*, 158 Ill. 2d 98, 102 (1994) (stating "[i]t has long been established that any act of a landlord which affirms the existence of a lease and recognizes a tenant as his lessee after the landlord has knowledge of a breach of lease results in the landlord's waiving his right to forfeiture of the lease").

¶ 74                                  E. Easements

¶ 75    Finally, 1600 Western and Music zone challenge the court's finding that no implied easements exist over the North Property for the benefit of the South Property.[11] Specifically, 1600 Western asserts that the trial court failed to recognize an easement by necessity to access the Functional Docks. Music Zone adds that the court failed to recognize an easement by necessity to park in the Big Lot. Despite framing its claim as one for an easement by necessity, Music Zone cites case law pertaining to easements by prior use. RM responds that Music Zone is entitled to neither form of an implied easement. Given that RM has had the opportunity to address both forms of easement, we will treat Music Zone's brief as seeking both.

¶ 76    In reviewing the trial court's judgment following a bench trial, we must determine whether the court's findings were against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A court's judgment is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent, or the court's finding is unreasonable, arbitrary or not based on the evidence. *Kovac v. Barron*, 2014 IL App

---

[11] Although 1600 Western asserted a freestanding claim for an easement, Music Zone raised its claim for an easement only as an affirmative defense to foreclosure. Having vacated the consent judgment of foreclosure to which the easement was a defense, it would arguably be premature  to consider Music Zone's assertion at this juncture. Yet, we find it appropriate to do so given that a trial has already ensued upon it and that the defense is somewhat intertwined with 1600 Western's claim.

(2d) 121100, ¶ 58. Furthermore, a reviewing court will not overturn the trial court's findings merely because it would have reached a different conclusion had it been the trier of fact. *Flynn v, Maschmeyer*, 2020 IL App (1st) 190784, ¶ 70. It is the trial court's role to resolve conflicts in the evidence and make credibility determinations. *Kovac*, 2014 IL App (2d) 121100, ¶ 59.

¶ 77                                    i. Implied Easements

¶ 78    Easements may be implied by necessity or from a preexisting use. *Dudley v. Neteler*, 392 Ill. App. 3d 140, 144 (2009). The claimant has the burden of proving the right to an easement by clear and convincing evidence. *Katsoyannis v. Findlay*, 2016 IL App (1st) 150036, ¶ 28; see also *Granite Properties v. Manns*, 117 Ill. 2d 425, 434-35, 439-440 (1987) (stating that the degree of necessity required to show an easement favoring the conveyor is greater than that required for an easement favoring the conveyee); but see *Gacki v. Bartels*, 369 Ill. App. 3d 284, 290 (2006) (stating that all doubts are resolved against the conveyor, who had the power to protect his interests by reserving access in the instrument conveying the property). Moreover, implied easements result from the intention of the parties to the conveyance. *Id.*

¶ 79    RM argues that 1600 Western and Music Zone have not shown that 1600 Western and Lakeside Bank intended to create an easement when the Forbearance Agreement and deed in lieu of foreclosure were executed. We find that RM misunderstands the intent underlying implied easements.

¶ 80                                    ii. Intent

¶ 81    Implied easements "arise as an inference of the intention of the parties." *Granite Properties*, 117 Ill. 2d at 437. Courts ascribe an intention to parties who did not put said intention into words at the time of the conveyance in question. *Canali v. Satre*, 293 Ill. App. 3d 407, 408 (1997); *Emanuel v. Hernandez*, 313 Ill. App. 3d 192, 196 (2000). In addition, courts even ascribe

an intention "to parties who actually had formed no intention conscious to themselves." *Granite Properties*, 117 Ill. 2d at 437. For an easement by necessity, the necessity alone supports the presumption that the parties did not intend to render the land in question unfit for occupancy. *Id.* at 438; *Katsoyannis*, 2016 IL App (1st) 150036, ¶ 28. The necessity itself furnishes the probable inference. *Granite Properties*, 117 Ill. 2d at 438; *Gacki*, 369 Ill. App. 3d at 290. In the case of an easement implied from prior use, the prior use itself constitutes evidence of the parties' intent based "on the presumption that the grantor and the grantee would have intended to continue an important or necessary use of the land known to them that was apparently continuous and permanent in its nature." *Granite Properties*, 117 Ill. 2d at 438. Thus, so long as the parties seeking an implied easement otherwise establish the easement's requirements, no additional proof of intent is required.

¶ 82     Notwithstanding the forgoing principles, RM asserts that the Forbearance Agreement affirmatively shows that Lakeside Bank, Lakeside SPE and 1600 Western did not intend for the North Property's conveyance to be subject to an easement. See also Restatement (Third) of Property (Servitudes) § 2.15 (2000) (stating that an implied easement exists where a conveyance would deprive the land conveyed of rights necessary to reasonably enjoy the property "unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights").

¶ 83     The Forbearance Agreement, which was drafted by outside counsel for Lakeside Bank, does not clearly indicate that 1600 Western intended for the conveyance of the North Property to extinguish any implied easements. First, 1600 Western executed that agreement in its capacity as owner of the North Property and as an obligor on loans having no bearing on the South Property. Thus, it is not clear that 1600 Western intended for the South Property to relinquish anything. In

addition, 1600 Western's statement that it was conveying all of its right, title and interest in the North Property must be viewed in that capacity. While the Forbearance Agreement also stated that there were no outstanding "encumbrances or material matters of Record" against the North Property, *implied* easements are, by nature, not of record. Furthermore, Howe, as the prior manager of Lakeside Bank, testified that he understood the Forbearance Agreement to transfer the North Property with no easements, but he also acknowledged that the agreement did not refer to easements and the parties never discussed whether 1600 Western would continue to access the North Property. Years after the Forbearance Agreement and the deed in lieu of foreclosure were executed, tenants of the South Property continued to access the North Property without objection. We find no circumstances indicating that the parties affirmatively intended to deprive the South Property of rights to access the North Property.

¶ 84                                    iii. Unity of Title

¶ 85    Easements by necessity and prior use also require that the dominant and servient properties were at one time under a unity of title. See *Emanuel*, 313 Ill. App. 3d at 197; *Granite Properties*, 117 Ill. 2d at 436; see also *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill. 2d 36, 53 (2007) (stating that "an easement appurtenant runs with the land"). According to RM, unity of title is strictly limited to instances where two properties were previously a single parcel of land. The trial court took a similar view. We disagree.

¶ 86    Section 2.11 of the Restatement (Third) of Property (2000), Commend d, states that "[c]reation of servitudes by implication *normally* arises on severance of a single possessory interest into two or more possessory interests." (Emphasis added.) It follows that implied easements do not always arise from the severance of a single possessory interest. See *Id*. Indeed, decisions from this state acknowledge that implied easements may be created following common

27

ownership of multiple, adjoining parcels. *Granite Properties*, 117 Ill. 2d at 428, 436 (using "common ownership" and "unity of title" synonymously); *Dudley*, 392 Ill. App. 3d at 145 (quoting *Leitch v. Hine*, 393 Ill. 211, 225-26 (1946)) (recognizing implied easements following the sale of land by the "owner of a tract of land or of two or more adjoining parcels"); *Katsoyannis*, 2016 IL App (1st) 150036, ¶ 28 (stating that the properties involved must have been "owned by a common grantor" and subsequently severed); *Gacki*, 369 Ill. App. 3d at 290, 291 (similar); *Emanuel*, 313 Ill. App. 3d at 197 (similar); *Canali*, 293 Ill. App. 3d at 408 (stating that one family originally "owned all of the subject properties"); but see *Martin v. See*, 232 Ill. App. 3d 968, 981 (1992) (stating that "there may have been common ownership of the two tracts of land; [but] the land was never one parcel which was severed," precluding an implied easement). Accordingly, we find that in the context of implied easements "unity of title" encompasses not only a single possessory interest but adjacent properties under common ownership.

¶ 87                              iv. Easements By Necessity

¶ 88    We now turn to the parties' claims for implied easements by necessity. To establish an easement by necessity, a party must establish a unity of title between the alleged dominant property and the alleged servient property, a subsequent separation of title, and the necessity to access the servient property. See *Weaver v. Cummins*, 323 Ill. App. 3d 359, 364 (2001). While an easement by necessity most often arises when a parcel becomes landlocked upon conveyance, such an easement may also exist where the conveyance renders that parcel "otherwise incapable of enjoyment. *Dudley*, 392 Ill. App. 3d at 144-45.  Easements by necessity are not limited to only ingress and egress (*Smith v. Heissinger*, 319 Ill. App. 3d 150, 155 (2001)) and have been recognized to access utilities and other services (*Gacki*, 369 Ill. App. 3d at 293). Additionally, an easement by necessity will not be denied merely because it impairs or reduces the servient

estate.[12] *Id*. at 291. While absolute necessity is not required, an easement will not be sanctioned if reasonable alternatives are available. *Rexroat v. Thorell*, 89 Ill. 2d 221, 230-31 (1982); *Smith* , 319 Ill. App. 3d at 156.

¶ 89     Here, it is undisputed that 1600 Western Avenue owned the adjacent North Property and the South Property, although they were improved by a public alley running along their border. This satisfies the unity of title required to establish an implied easement. In addition, that title was separated when 1600 Western conveyed the North Property to Lakeside SPE. The only remaining question is whether tenants of the South Property possess the necessity to access the North Property.

¶ 90     Several tenants of the South Property testified that without the Functional Docks, their businesses could not function. Indeed, it is difficult to envision a scenario in which any commercial, industrial facility could function without a working dock. In addition, the uncontradicted evidence showed that the building contained no other serviceable dock, let alone one that connected to the entire building. Contrary to the trial court's finding, the uncontradicted testimony and the plat survey showed that the Functional Docks could not be accessed solely through the public alley. Specifically, the stairs and the building's only disability entrance to the South Property was located in the alley and blocked access from the alley to those docks. Furthermore, trucks required room to maneuver on the North Property to back into the Functional Docks. Accordingly, the trial court's finding that the evidence did not show the South Property's tenants needed to enter the North Property to access the Functional Docks was against the manifest weight of the evidence. *Cf. Gacki v. Bartels*, 369 Ill. App. 3d at 292 (stating that the

---

[12] We note that while RM argues an easement would impair the North Property, it disregards that the North Property cannot be accessed without driving through the South Property's  driveway and Small Lot.

plaintiff presented no evidence to show that no other public way was available to his parcel at the time of severance).

¶ 91    RM argues that the stairs and ramp were impermissibly built upon the public alley, and suggests that it was incumbent upon 1600 Western to remove the stairs and ramp or find a way to reconstruct the property to render an unserviceable dock serviceable again. Under these circumstances, those suggestions do not present reasonable alternatives.

¶ 92    Despite regular inspections of the South Property, the City has never objected to presence of the stairs and ramp on the alley. Similarly, the City has not objected to the South Property's tenants parking in the alley. The City may be disinclined to object given that (1) the alley stops at the train tracks immediately to the west of the South Property, (2) only the South Property's tenants need to reach that point, and (3) the challenged stairs and ramp have for many years supported the productive use of the South Property. See also *Canali*, 293 Ill. App. 3d at 411 (stating that the reviewing court's determination regarding an easement was not contingent on compliance with the county's width requirements). Furthermore, implied easements by necessity generally are meant to prevent property from becoming unfit for occupancy. See *Granite Properties*, 117 Ill. 2d at 438. Even assuming that the suggested changes to the building on the South Property are technically possibly, RM's suggestion would itself render that property unfit for occupancy until significant construction work could be completed. *See also Weaver*, 323 Ill. App. 3d at 364 (stating that "[r]equiring plaintiffs to install culverts, build a pond, and bring in large amounts of fill to construct a potentially dangerous road is unreasonable when a road over defendants' property exists to allow plaintiffs safe access to the public road").

¶ 93    Accordingly, the trial court's determination that 1600 Western and its tenants were not entitled to an easement by necessity to travel across the North Property to access the South Property's Functional Docks was against the manifest weight of the evidence.

¶ 94                                        v. Easement by Prior Use

¶ 95    We also find that the trial court erroneously determined that Music Zone was not entitled to an easement by prior use to park in the Big Lot on the North Property.

¶ 96    An easement by prior use requires (1) common ownership of the dominant and servient parcels followed by a conveyance or transfer separating ownership; (2) the prior use of one part of the united parcel for the benefit of another part, in an apparent, obvious, continuous and permanent manner; and (3) evidence that an "easement is necessary and beneficial to the enjoyment of the parcel conveyed or retained by the grantor or transferrer." *Granite Properties*, 117 Ill. 2d at 435. When one portion of a property bestows a benefit upon another portion of the property and is severed by conveyance, the grantee takes the servient property "with all the benefits and burdens that appear to belong to it." *Canali*, 293 Ill. App. 3d at 409. In addition, the necessity required to establish an easement by prior use is lesser than the necessity required to establish an easement by necessity. *Id*. at 410. The claimant need only show a reasonable necessity, which exists "when it is reasonably convenient to use the land benefited." *Granite Properties*, 117 Ill. 2d at 440.

¶ 97    We have already determined that the North and South Properties were subject to a unity of title followed by severance. Accordingly, we consider the remaining elements of an easement by prior use.

¶ 98    The record shows that tenants of the South Property have been openly parking on the cement Big Lot for decades, even before 1600 Western owned either the South Property or the

North Property. Thus, the evidence clearly shows that part of the North Property was used for the benefit of the South Property in an apparent, obvious, continuous and permanent manner. See *Id.* at 439 (finding an implied easement by prior use where "the driveways in question had been used by the plaintiff or its predecessors in title since the 1960's, *** [and] were permanent in character, being either rock or gravel covered, and *** the defendants were aware of the driveways' prior uses" before purchasing their property).

¶ 99     The record also shows that this use is reasonably necessary and convenient for the South Property. The Small Lot holds only 25 spaces. Even if food trucks were not occupying those spaces, it would still be insufficient for the number of tenants, employees and customers who use the Big Lot. In addition, no parking is permitted on Western, and parking on 16th Street is impractical due to Cinespace. Furthermore, the safety of the South Property's patrons is a relevant consideration. Accordingly, the record shows that an implied easement is necessary and beneficial to the enjoyment of the South Property so as to create an implied easement by prior use for the South Property's tenants to park in the Big Lot located on the North Property. The trial court's finding to the contrary was against the manifest weight of the evidence.

¶ 100   In light of our determination that easements exist for the benefit of the South Property, the trial court must determine the precise physical parameters of those easements based on the implication at the time of severance. See *Gacki*, 369 Ill. App. 3d at 293. We reverse and remand for that purpose.

¶ 101                                          III. Conclusion

¶ 102   The consent judgment of foreclosure was improperly entered without Music Zone's consent under these circumstances. Additionally, the trial court erroneously declined to recognize an implied easement by necessity over the North Property for the South Property's tenants to

access the Functional Docks. Furthermore, the court failed to recognize an implied easement by prior use over the North Property for the South Property's tenants to park in the Big Lot.

¶ 103   For the foregoing reasons, we vacate the consent judgment, reverse the judgment denying easements for the benefit of the South Property, and remand for further proceedings consistent with this decision. We affirm the judgment in all other respects.

¶ 104   Affirmed in part, vacated in part, reversed in part. Cause remanded.